THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KENNETH EARL SLAUGHTER, Defendant-Appellant.

First District (1st Division)    No. 78-2147

Opinion filed May 27, 1980.

James J. Doherty, Public Defender, of Chicago (Geraldine V. Biggs and James L. Rhodes, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Mary A. Jischke, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Kenneth Earl Slaughter, was charged by information with the murder of James Sanderson in violation of sections 9—1(a) and 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1(a), 9—1(a)(2)). Following a jury trial, defendant was found guilty of murder and sentenced to not less than 18 years nor more than 25 years in the Illinois Department of Corrections.

On appeal, defendant contends that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred in refusing to give his

jury instruction on "provocation" voluntary manslaughter; (3) the evidence supports reduction of his conviction to voluntary manslaughter; (4) the trial court erred in giving Illinois Pattern Instructions, Criminal, Nos. 24.09 and 24.11 (1968) (hereinafter IPI); (5) the State's closing argument was prejudicial; and (6) the trial court erred by refusing the jury's request to review defendant's testimony.

Johnnie Mae Sanderson testified that she was James Sanderson's aunt. On December 8, 1977, her nephew lived with Ella Comer. That day, at about 6:30 p.m., Sanderson went to her nephew's birthday party at Comer's apartment. Sanderson saw defendant conversing with Comer. At about 8:30 p.m., James Sanderson and Comer told everyone that they wanted to be alone and the party was over. When defendant refused to leave, James Sanderson caught him by the sleeve, asked him to leave and escorted him to the door. Defendant took a long, thin knife from his pocket and pointed it towards James. When the witness told defendant there was no need for this and requested that he leave, defendant left.

On cross-examination, Sanderson testified that James had been drinking but did not appear drunk. She did not know if defendant had been drinking and he appeared sober. Before the guests were asked to leave, a teenage boy fell onto the kitchen table and cracked it. Sanderson testified that her nephew did not choke defendant.

Ella Comer testified that she lived with James Sanderson on December 8, 1977, and that they were engaged. Comer had known defendant about six or seven weeks prior to Sanderson's birthday party. She saw defendant on December 8 at about 12:30 p.m. at her apartment. Defendant stated that Sanderson was fat and ugly and asked her why she wished to marry someone like him. When he told her that Sanderson was not going to marry her, she asked defendant to leave.

At the party, at about 8:30 p.m., Comer's brother Anthony became intoxicated and fell on the kitchen table, breaking it. Sanderson then asked everyone to leave. When defendant remained, Sanderson again asked him to leave, grabbed him by the sleeve and led him toward the door. Comer heard Johnnie Mae Sanderson tell defendant to put the knife away. Defendant left the apartment.

Comer further testified that about 15 or 20 minutes later defendant returned and stood in the doorway. He asked Comer if she would come out on the ramp because he wanted to talk. She declined, but he kept repeating this request. Comer stated that defendant asked Sanderson if she could come out on the ramp and talk. Sanderson said that she was not going anywhere. Sanderson and her brother Reginald then went to the door. Because her back was to the door, Comer did not see what happened. A moment later Sanderson shouted, "Stop that, nigger." He was bleeding profusely from the left side of his chest. Comer and other

family members took Sanderson to the hospital, where he was pronounced dead on arrival. Comer testified that Sanderson was unarmed and that she did not see him do any physical harm to defendant.

On cross-examination, Comer testified that Sanderson, defendant and she were drinking at the party. Comer believed defendant had been flirting with her the day of the incident and during the weeks preceding it. She told decedent's mother she felt responsible for his death.

Reginald Cross, Comer's 14-year-old brother, substantially corroborated his sister's testimony. When defendant refused to leave the party, Sanderson grabbed him by the sleeve and pushed him toward the door. Defendant pulled out a knife, but left when Johnnie Mae Sanderson intervened.

Cross further testified that when defendant returned and attempted to talk to Comer, Sanderson went to the door. Sanderson did not threaten defendant before he walked towards him, nor did he beat defendant anytime that night. Sanderson never touched defendant before he was stabbed, but held his arms out, with the palms of his hands extended toward defendant. However, Cross also testified that Sanderson walked up to defendant first, pushed him, and defendant stabbed him.

Officer Rokosik testified that he arrested defendant and advised him of his *Miranda* rights. Rokosik asked defendant if he was Kenny and if he had been to Comer's apartment. Defendant responded, "Yeah, I am the one that did it and I'm glad I did it." As defendant was being handcuffed, he was asked if he had any weapons. He took a knife from his righthand pocket and said, "This is the knife I used here." Defendant also said the reason he had stabbed the victim was because Sanderson grabbed him by the tie. Defendant said, "You don't grab no nigger that is wearing a tie by the tie." On the way to the station, defendant kept repeating, "I hope he dies; I hope he dies; I'm glad I did it." Defendant wanted the police to take him to the hospital so he could stab Sanderson again. Officer Rokosik subsequently learned that Sanderson had been pronounced dead upon arrival at the hospital.

James Newton, a Cook County Assistant State's Attorney, testified that he interviewed defendant at about 11:30 p.m. on December 8, 1977. Defendant said that while he was at the party Sanderson grabbed him by the collar and started choking him. Defendant told Newton that he returned to his apartment and realized that his mama didn't raise no fool, didn't teach him to back down to anybody. Defendant further stated that he changed his clothes, went back to Sanderson's apartment and that this time when James grabbed him again, he didn't give him a chance to choke him. Defendant said that he just saw the victim's big stomach sticking out at him and he just stabbed him.

Investigator Francis Kehoe testified that he interviewed defendant after his arrest. Defendant stated that at the party Sanderson grabbed him by the collar, choked him and threw him out of the apartment for no reason. Defendant further stated that he went upstairs to his apartment and changed into shoes more suitable for fighting. He returned to Comer to determine why Sanderson had jumped on him. Defendant stated that Sanderson again attempted to grab him and this time he stabbed Sanderson. Defendant thought Sanderson was going to choke him again. Finally, defendant said that he wished he could have stabbed Sanderson nine more times, but fled because someone in the apartment might have had a gun.

Defendant testified in his own behalf that on the afternoon of December 8, 1977, he talked to Ella Comer in her apartment. He told Comer that Sanderson cared for another woman and was calling her that day. Defendant denied telling her that he would do everything he could to prevent her from marrying Sanderson or that she should not marry Sanderson because he was fat and ugly. At the party that night, defendant was "high." At about 8:30 p.m. he heard a noise from the kitchen. Sanderson got up and started screaming at defendant. When defendant asked what did he do, Sanderson continued screaming and cursing and said, "You know, you know." Sanderson grabbed defendant in the chest and threw him against the wall and then grabbed defendant's throat and started choking him. When Sanderson eased up, defendant moved toward the door and pulled his knife from his pocket. Defendant told Sanderson, "Don't come to me, don't grab me no more," and eased out the door. Defendant testified that Sanderson appeared intoxicated and angry during the altercation.

Defendant went upstairs to his sister's apartment. He removed his jacket and tie and changed shoes because a heel was broken. He continued to wear the same pants with his knife in the back pocket. About 20 minutes later, defendant returned to Comer's apartment because he wanted to find out why Sanderson had jumped him. Standing outside the screen door, defendant called Comer two or three times. He then saw Sanderson coming toward him with his hands outstretched. Sanderson grabbed him, placing one hand on his shirt and jacket and the other hand on his throat. Defendant stated that he was afraid Sanderson was going to beat him up pretty badly or kill him. He moved to get away from Sanderson, who was bigger and stronger than he. When Sanderson was choking defendant and he could not get away, defendant became frightened and stabbed Sanderson to get him off. Defendant returned to his sister's apartment. A few minutes later, Sanderson's brother came to the apartment and cursed defendant. Defendant explained that the only

reason he stabbed Sanderson was to get him off. When Sanderson's brother resumed cursing and swung a knife at defendant, he ducked and closed the door on him.

When the police arrived, defendant told them he stabbed Sanderson and gave them the knife. He denied telling them that he hoped Sanderson would die and denied asking to go to the hospital to stab him again. Defendant also denied telling Investigator Kehoe that he changed into clothes more suitable for fighting or that he wanted to stab Sanderson nine more times.

Terry Lynn Flowers, defendant's sister, testified that she was present at the party at Comer's apartment. When she left the party, defendant was still there. Defendant subsequently returned to her apartment, took off his jacket and changed into another pair of dress shoes because a heel was broken. Defendant told her that he was going to talk with Comer to find out why Sanderson had grabbed him by the collar and put him out. Sometime after defendant returned, the police arrived. They asked for defendant and he gave them his knife. Flowers testified that her brother did not tell the police that he hoped Sanderson dies.

Defendant argues that he was not proved guilty of murder beyond a reasonable doubt because the State failed to prove he was not acting in self-defense. Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—1), on the use of force in defense of person, provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, * * *."

Where the affirmative defense of self-defense is raised, the State must prove the defendant guilty beyond a reasonable doubt as to that issue, together with all other elements of the offense. (Ill. Rev. Stat. 1977, ch. 38, par. 3—2(b).) The State met this burden.

The defendant's argument presents only his testimony and ignores the State's case. Defendant testified that when he was at Sanderson's party, Sanderson grabbed him, threw him against the wall and choked him. However, the State's witnesses indicated that Sanderson asked defendant to leave the party and when he refused, took defendant's sleeve and walked him to the door.

Defendant also relies on his testimony that the victim grabbed him and choked him immediately before he stabbed the victim. He then asserts that his testimony was corroborated by Reginald Cross, a State

witness. The record fails to support this assertion. Rather, Cross testified on direct and cross-examination that Sanderson approached defendant with his arms extended but never touched defendant when he was stabbed. Indeed, when the attorneys disagreed as to how to characterize Cross' reenactment of the scene, the court interjected: "I think the record should show the palms of his [Sanderson's] hands were extended towards him [defendant]."

Where the evidence is conflicting, it is the province of the jury to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) A court of review will not substitute its judgment for that of the trier of fact as to witness credibility. (*Manion.*) Moreover, whether the use of deadly force was justified is a fact question for the jury, and their determination will not be disturbed on appeal unless the evidence is so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt. *People v. Acevedo* (1976), 40 Ill. App. 3d 105, 351 N.E.2d 359.

We will not reverse the verdict or judgment simply because the jury chose to believe the State's testimony. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) The jury apparently believed that defendant stabbed an unarmed man who was not choking him and may not even have touched defendant.

Defendant's second contention is that the trial court erred by refusing to give his instruction on "provocation" voluntary manslaughter. Defense counsel tendered IPI Criminal No. 7.04 (based upon Ill. Rev. Stat. 1977, ch. 38, par. 982(a)(1)) to the trial court. This instruction, concerning killing under sudden and intense passion resulting from serious provocation by the deceased, was rejected by the court. The jury was given IPI Criminal Nos. 7.05 and 7.06, based upon section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b)) ("unreasonable belief" voluntary manslaughter—belief in self-defense that is unreasonable).

■■ If there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, an instruction defining manslaughter should be given. (*People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897.) Moreover, when there is evidence in the record to support "unreasonable belief" voluntary manslaughter as well as "provocation" voluntary manslaughter, the court must give instructions on both. *People v. Craven* (1973), 54 Ill. 2d 419, 299 N.E.2d 1; *People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764.

Assuming, *arguendo*, that defendant's testimony that Sanderson grabbed him and choked him before the fatal stabbing could constitute serious provocation, we find that the record is devoid of evidence that defendant acted under sudden and intense passion due to provocation.

The state of mind involved in "provocation" voluntary manslaughter has been described as an act of passion or sudden act of revenge. (*People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764.) Defendant, however, consistently testified that his actions were defensive and motivated by fear and a desire to escape from Sanderson.

According to defendant, at the party Sanderson threw him against the wall and choked him. When Sanderson eased his grip, defendant retreated, pulled out his knife and said, "Don't come to me, don't grab me no more." He then eased out the door. Twenty minutes later defendant returned. He testified that Sanderson grabbed him again, placing one hand on his jacket and the other on his throat. Defendant testified that he stabbed Sanderson because he was afraid that Sanderson, who was bigger and stronger, would kill or seriously injure him. He attempted to get away from Sanderson and stabbed him to get him off. Moreover, defendant subsequently explained to Sanderson's brother that the only reason he stabbed Sanderson was to get him off.

■■ In short, defendant was motivated by fear and claimed to have acted in self-defense, rather than motivated by sudden and intense passion due to serious provocation. Accordingly, the trial court's decision not to give an instruction on "provocation" voluntary manslaughter was proper.

Defendant's third contention is that the evidence does not support a conviction for murder but only a conviction for either "provocation" or "unreasonable belief" voluntary manslaughter. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—2(a)(1), 9—2(b).) He requests that we invoke our authority under Supreme Court Rule 615(b)(3) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(3)) to reduce his conviction from murder to voluntary manslaughter. We found no evidence of "provocation" voluntary manslaughter in connection with defendant's second argument and again reject this contention.

With respect to "unreasonable belief" voluntary manslaughter, we note that the jury was fully instructed on this issue and was called upon to resolve conflicting evidence. Defendant presented evidence, summarized above, concerning self-defense. To the contrary, the State presented ample evidence that defendant either intended to kill Sanderson or knew his actions created a strong probability of death or great bodily harm. Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1) and (2).

The State's evidence indicated that defendant had been flirting with Sanderson's fiancee and had threatened to halt the marriage. At the party, Sanderson led defendant to the door after defendant refused to leave upon request. He returned about 20 minutes later, after changing into clothes more suitable for fighting, and was again confronted by Sanderson. The victim was not armed and had not threatened, hit or

choked defendant. Defendant fatally stabbed Sanderson while Sanderson was reaching towards him. Defendant was also reported to have made numerous incriminating statements to law enforcement personnel.

The essential difference between murder and voluntary manslaughter is the mental state of the accused at the time of the killing. (See *People v. Smith* (1970), 121 Ill. App. 2d 105, 257 N.E.2d 261.) It was the province of the jury to ascertain defendant's mental state and to resolve conflicts in the evidence. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.) In our view, the evidence overwhelmingly supports their verdict.

Defendant's fourth contention is that the trial court erred in giving IPI Criminal Nos. 24.09 and 24.11 over his objection. These instructions read:

> IPI Criminal No. 24.09: "A person who initially provokes the use of force against himself, is justified in the use of force only if
>
> (1) the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person; or
>
> (2) he in good faith withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."
>
> IPI Criminal No. 24.11: "A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person."

At issue is whether there was evidence that defendant was the aggressor. *People v. Walker* (1978), 58 Ill. App. 3d 535, 374 N.E.2d 880.

The Committee Comments (Ill. Rev. Stat. ch. 38, par. 7—4 (Smith-Hurd 1973)) state:

> "Most of the reported Illinois cases concerning the rights of the defendant as the aggressor involve provocation consisting of a direct assault, deadly or non-deadly. A few, however, involve the use of words or actions other than assault. (*E.g., People v. Grosenheider*, 266 Ill. 324, 107 N.E. 607 (1914),—closing disputed right of way; *Gedye v. People*, 170 Ill. 284, 48 N.E. 987 (1897)— landlord obstructing chimney and removing windows from tenant's house; *Greschia v. People*, 53 Ill. 295 (1870)—goading victim with provoking words to re-enter defendant's dwelling.)"

In *Greschia v. People*, defendant was indicted for murder and found

guilty of voluntary manslaughter. As the victim turned to go upstairs, defendant said, "Come back, I will fix you." Defendant invited the victim to "come on," thereby provoking him.

In *People v. Curwick* (1975), 33 Ill. App. 3d 757, 338 N.E.2d 468, the court discussed provocation in connection with a voluntary manslaughter charge. Generally, provocation is restricted to physical assault, mutual quarrel or combat, or adultery. Mere words, no matter how aggravating or abusive, do not supply adequate provocation; however, this rule is not absolute. (See *People v. Ahlberg* (1973), 13 Ill. App. 3d 1038, 301 N.E.2d 608; *People v. Newberry* (1970), 127 Ill. App. 2d 322, 262 N.E.2d 282.) Provocation was established in *Curwick*, where defendant shot the victim after she told him that she planned to marry his employer in a few days. The employer, who was visiting her at the time of the shooting, admitted to defendant that his relationship with the victim had been going on for a long time.

We note that defendant's brandishing his knife at the party might constitute an assault. Nonetheless, because of the lapse of 20-25 minutes, we must view defendant's conduct during the second encounter with Sanderson independently. Defendant stood outside the screen door, repeatedly asking to speak to Comer. She either declined or said nothing. Sanderson told defendant she was not coming out to talk to him. At this point, Sanderson approached defendant and was stabbed. Under these circumstances, defendant did not invite Sanderson to "come on," and he was not the aggressor by virtue of his language alone. There was no testimony that defendant's words were directed toward Sanderson, nor is there any evidence that defendant attempted to enter the premises. Accordingly, neither instruction should have been given to the jury.

■ However, due to the overwhelming evidence of guilt, this error is harmless. There was no question that defendant stabbed the victim, who was unarmed. The jury apparently believed the State's witnesses, who testified that the victim did not threaten or strike defendant. The jury was otherwise properly instructed regarding self-defense and "unreasonable belief" voluntary manslaughter and discounted defendant's theory of the case. Indeed, defendant's acts and statements after the stabbing prove beyond any reasonable doubt that he intended to kill Sanderson when Sanderson approached or he stabbed him knowing his act would result in death or great bodily harm. Accordingly, the error in giving these instructions does not justify reversal. See *People v. Ward* (1965), 32 Ill. 2d 253, 204 N.E.2d 741, *cert. denied* (1966), 384 U.S. 1022, 16 L. Ed. 2d 1026, 86 S. Ct. 1947.

Defendant's fifth contention is that the State's closing argument was prejudicial. The State maintains that defendant has waived this issue, in part, by failing to make timely objections. Although there is merit to this

argument, we resolve this contention against defendant on the merits.

Defendant first contends that he was prejudiced by the State's labeling of defense theories and evidence as "defense tactics." We find these remarks constitute legitimate inferences from the evidence and do not exceed the bounds of proper debate.

■ The prosecutor decried the "defense tactic" of asking Comer on cross-examination whether she talked to the State's Attorney before testifying. We believe the prosecutor was merely informing the jury that it is proper for a witness to talk to both the State's Attorney and defense counsel prior to testifying. He was trying to negate any inference that this was a deceptive practice.

Defense counsel also asked Comer whether she was using defendant to make Sanderson jealous. The prosecutor referred to this as a "defense tactic" because there was no direct evidentiary support and because he apparently believed defense counsel was attempting to obscure the issues of this murder trial by speculation on jealousy.

Next, defendant argues that the following comments implied that defendant was coached by defense counsel as to his testimony about the confrontation with decedent's brother:

> "And he [defendant] has to put this thing in, the brother coming up there and he is going to sit up there and tell us he took the knife out of his pocket and said to the victim's brother, who he says was in a rage, who he says was slashing at him with the knife, which has nothing whatsoever to do with the crime of murder, but is merely a defense tactic—
>
> [Defense counsel]: Objection, your Honor.
>
> [Prosecutor]: —and think about what happened afterwards. ✳ ✳ ✳"

These remarks suggested that defendant's account was improbable and did not prove or disprove the elements of murder. No reference is made to defense counsel or coaching witnesses.

■■■ Last, defendant asserts that the following remarks were improper:

> "[Prosecutor]: But [defense counsel] wants to dirty it up and put in dirt. Didn't he tell you about some young lady James Sanderson was seeing? Oh, come on, what young lady? If that is true, where is that young lady? Those people have subpoena powers, they have investigators. Where is that young lady? Or better yet, what is her name? What is that lady's name?
>
> . They could make up a name. Well, what apartment does she live in? What building does she live in? Nonsense. That is a typical defense tactic. Dirty up our girl, Ella Comer, make her feel responsible, more responsible than she does already."

Generally, it is improper for the State to comment upon a defendant's

failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is accessible to the State. (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 332 N.E.2d 543.) Defendant did not reveal the name of the woman he claimed Sanderson cared for and her identity was unknown to the State. Thus, it was proper for the prosecutor to comment upon her failure to testify in corroboration of defendant's allegations. It was not error for the State to suggest that her failure to testify was a defense tactic.

Defendant asserts that during closing argument the prosecutor improperly accused him of lying:

> "Then we have the testimony of what I would term the law enforcement people in the case, two police officers and Mr. Newton.
>
> You heard from two police officers who testified to the statements that this man made to them that night, but yet that man takes the stand and says he doesn't remember making any of those statements.
>
> He testifies he doesn't remember making the statement, part of the statements he remembers, part he doesn't remember, but I want you to think of one important thing when you think of that man's testimony. Think of Officer Rokosik, and think of the defense attorneys, they never asked Officer Rokosik if the defendant asked or told them that James Sanderson's brother attacked him with a knife.
>
> Did they ask Officer Rokosik that one? Of course not, because he never did attack the defendant because the brother was never there, because that is nothing but a lie by the defendant. He made that up after he heard the State's case."

A prosecutor may not give his personal opinion during closing as to the veracity of a defense witness' testimony. (*People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311.) However, if based on the evidence and inferences from it, it is not error to suggest that a witness is untruthful. *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644; *People v. Jones* (1976), 41 Ill. App. 3d 321, 354 N.E.2d 104.

■■ Here, the prosecutor reviewed testimony as to statements made by defendant to the police. He noted there was no evidence that defendant told the police Sanderson's brother attacked him with a knife and concluded that defendant's testimony was fabricated. The prosecutor's conclusion was based on his interpretation of the evidence rather than personal opinion and was thus proper. See *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634 (prosecutor may discuss witness' credibility).

Defendant also complains of these remarks by the prosecutor:

"* * * [H]e [defendant] told Rokosik, I hope he is going to die. Rokosik did not make that up. That is the way it went down.

He surely is lying, ladies and gentlemen."

Officer Rokosik testified that defendant told him, "I hope he dies." Defendant denied this. The prosecutor's allegation that defendant was lying was a comment upon his credibility and based upon the evidence. ◼◼ Defendant also claims impropriety in the State's comments that there was no evidence of blood on the knife used to stab decedent and that defendant must have washed it off. Defendant asserts that there was no evidence that defendant washed off the knife. We have reviewed the record and find that defense counsel made timely objections to these remarks which were sustained by the trial court, thereby remedying any error. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Malone* (1979), 78 Ill. 2d 34, 397 N.E.2d 1377.

Last, defendant complains of a lengthy portion of the prosecutor's closing argument concerning Sanderson's right to be secure in his own home and self-defense. Defendant contends that the prosecutor improperly implied that defendant was inside Sanderson's home when the evidence was to the contrary. Upon review of the closing arguments, we note that the remarks are proper when construed in conjunction with Sanderson's right to ask defendant to leave the party and to escort him out of the house when he refused to leave. The remarks are vague, however, and may have been construed by the jury as relating to the time of the stabbing. The evidence indicates that at this time defendant was outside Sanderson's home. Even if the jury was misled, proper jury instructions on self-defense and the justifiable use of force were given to the jury which corrected any misunderstanding. See *People v. Pietrzyk* (1977), 54 Ill. App. 3d 738, 369 N.E.2d 1299.

In summary, we do not find any prosecutorial misconduct during closing arguments. Even if some of the prosecutor's remarks were improper, in light of the overwhelming evidence of defendant's guilt and the fact that the jury was instructed to reject arguments unsupported by the evidence, any error was not prejudicial.

Defendant's sixth argument is that the trial court erroneously refused to exercise its discretion regarding the jury's request to review defendant's testimony. The court stated for the record that during the course of jury deliberations the jury sent out a note saying, "Can we get the defendant's testimony?" The trial judge also stated: "And I sent back my reply, saying the defendant's testimony has not been written up. Sorry." No objection was made by defense counsel. Defendant asserts that the court's comments indicated the court believed it had no discretion to consider the jury's request. He suggests that the court stenographer could have read her notes to the jury.

██ It is within the discretion of the trial court to allow or refuse a jury's request for the review of testimony. (*People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.) Where trial courts have refused such requests under the mistaken belief that they have no discretion, such refusals are erroneous. *People v. Autman* (1974), 58 Ill. 2d 171, 317 N.E.2d 570; *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166.

The trial court's understanding of these principles was demonstrated when this issue was first raised upon defendant's motion for a new trial. In response to defendant's argument, the court replied:

"I think I should answer that. I was aware I had discretion. I chose to answer the note in that manner. I thought it would avoid complications as far as the jury was concerned. I was aware I had discretion. I didn't think it was necessary to either have it read to them or have it typed up."

Finally, defendant cites *People v. Briggman* (1974), 21 Ill. App. 3d 747, 316 N.E.2d 121, for the proposition that the proper practice is for the court to discuss the jury's request with defense counsel and the prosecutor before responding to it. Indeed, the trial court followed this procedure concerning another note from the jury requesting pictures of decedent's body. We agree that the better practice, consistent with the trial court's posture concerning the jury's other request, was to discuss the jury's request with counsel.

However, any error was not prejudicial. The *Briggman* court found defendant had been denied a fair trial because: (1) counsel and defendant were not present at the time of the jury's request to rehear certain specific testimony; (2) the trial court abused its discretion by not answering the request; and (3) the court's ambiguous response may have confused or misled the jury. In the instant case, only the first error resulted and coupled with the overwhelming evidence of defendant's guilt any error is harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; see *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

For all the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.