THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD DARE, Defendant-Appellant.

First District (4th Division)   No. 85—0619

Opinion filed January 23, 1986.

414

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Defendant was indicted for the murder of his common-law wife, Carliene Creger. Following a bench trial in the circuit court of Cook County, he was found guilty of the lesser-included offense of voluntary manslaughter (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)) and sentenced to serve 15 years in the penitentiary. In this appeal from that judgment, defendant contends that his conviction for this offense cannot be sustained because there was no evidence to indicate that he acted under a sudden and intense passion resulting from serious provocation or with an unreasonable belief in self-defense.

The record shows that defendant and the victim were alcoholics and resided in the second-floor apartment of a six-flat building at 950 North Damen Avenue in Chicago. They operated the laundromat located on the street level of the same building and worked 6½ days a week; on Wednesdays they finished at noon.

About 6 p.m. on Wednesday, May 23, 1984, Officer Robert Kero and his partner responded to a call at that address, and as they arrived, they observed ambulance personnel leaving with a white female who appeared to have been beaten. They were directed to defendant's apartment by neighbors on the scene, and when they entered they observed that the apartment was not well kept. There were beer cans and empty vodka bottles in the kitchen and in the

garbage can and bloodstains on the carpet in the living room. They retrieved a seven-inch stainless steel knife from the floor. Defendant was standing in the living room dressed in blue jeans and a blood-stained shirt which was hanging out over his pants; he appeared to be distraught. When they asked him what happened, defendant stated that he had gone to a tavern with friends, and when he came home, he found the victim on the floor badly beaten and stabbed. Defendant was placed under arrest, advised of his rights and transported to the station. During the booking procedure defendant stated that he was asleep that afternoon, and when he awoke, he found the victim lying on the floor. It appeared to the officer that defendant had been drinking and was showing the moderate effects of alcohol at this time.

Detective Ben Wieclawek entered the investigation and observed the victim at the hospital. She was still alive then, and he noticed that her face, an eye and her jaw were injured and that she had been stabbed in the side. He then spoke with neighbors at the scene of the crime, and conversed with defendant at the police station. Defendant asserted that he was aware of his constitutional rights, then told him that he had been drinking in his apartment and sent the victim out to buy more liquor. When she returned, he went to sleep for a period of time, and when he awoke he found her lying on the living room floor. Defendant's bloodstained shirt was inventoried and sent to the laboratory for examination.

Raymond Hobson testified that he is 23 years of age and lived across the street from defendant. Sometime in the late afternoon on the day in question, defendant called him over and told him that the victim had been raped and beaten. He stated that he had known the couple for about a year and observed that they spent most of their day drinking, including the hours they were on the job. On the day of the incident he saw the victim about 10 a.m., and observed that she had a black eye and several bruises on her arms. A few days before that he was present in their apartment when defendant hit the victim several times and, with a knife held in his hand, stated that one of these days he was going to kill her.

Timothy Akers, a 23-year-old student who lived in the apartment directly below defendant and the victim, testified that on the day of the incident he first saw the victim at the laundromat in the morning, then saw her again in the late afternoon when she came downstairs and asked him to help her move some furniture. While he was in the apartment helping her, defendant asked her to go to the store and get some more beer, cigarettes and vodka. When she returned a

few minutes later, she did not have any vodka with her and defendant specifically asked about it. The victim replied that they would not give her any. At that response defendant slapped her face with the back of his hand, knocking her glasses off and causing the bridge of her nose to bleed. After attending to the injury, Akers left the apartment and went across the street to his sister's home. When he returned about 15 minutes later, he heard booming noises coming from the kitchen of defendant's apartment. He knew that defendant and the victim drank heavily on Wednesday afternoons, and he frequently heard bumping and noise coming from their apartment. After hearing these noises on other occasions, he had observed the victim with black eyes or bruises. On this day he went back to his sister's residence, and when he returned he spoke to his mother, then entered defendant's apartment. At that time, he observed the victim lying in the living room; her blouse had been ripped off, her skirt was pulled up and her eyes were black. He noted that they were not discolored when he saw her in the morning but did not recall whether they were when he saw her in the afternoon.

Patricia Akers, mother of Timothy, testified that she also lived in the apartment below defendant and the victim. On the afternoon in question she was in her kitchen when she heard what sounded like a chair falling over then heard a pounding sound which lasted for several minutes. As she left her apartment to cross the gangway to her daughter's place, she encountered defendant, who told her he had just awakened and asked her to check on the victim, who had been beaten and raped. Mrs. Akers went up to the apartment and saw her lying on the floor, then called for an ambulance and the police. She knew that defendant and the victim drank heavily, particularly on Wednesdays and Saturdays, and when she spoke with defendant that day, she observed that he was so drunk that he could barely stand up and had to hold onto the side of the building.

Georgianna Akers, the 12-year-old daughter of Patricia Akers, testified that she had seen the victim in the laundromat earlier in the day, and at that time she did not appear to have been beaten. When she went up to the victim's apartment later in the day, she found her lying on the floor; her clothes were in disarray and she was moaning and moving her head back and forth. The victim told her that defendant was responsible for her injuries.

The parties stipulated that the victim had type "A" blood, and that the stains found on defendant's shirt were of the same blood type. The parties also stipulated that at the time of her death, the victim's blood contained .237% alcohol, but was negative for barbitu-

rates, and that her death was caused by four stab wounds to her chest and abdomen.

Defendant testified that he is 54 years of age and had met the 44-year-old victim about nine years before when he found her beaten in an alley. He stated that he has been drinking since childhood and has been hospitalized for his condition twice but continues to drink heavily on a daily basis. He operated the laundromat with the victim and they spent their earnings of $25 a day on liquor. When they drank heavily, they would fight and often argued over sexual preferences. Their fights became physical, and he related that in the past the victim had struck him with a knife and a shoe and on one occasion split his head open with a broom handle. He also recalled an incident where he cut the victim's leg while he was peeling potatoes but did not remember doing it.

On the day in question, he and the victim arose at 5 a.m., found two cans of beer in the refrigerator and drank them before opening the laundromat at 6:30 a.m. He then sent the victim to the store about 11:30 a.m. to get some more beer and vodka, and when she returned he took the purchases to the apartment and started drinking. He recalled that Tim Akers came into the apartment that afternoon, but he did not remember hitting the victim, knocking her glasses off or getting into a quarrel with her. He did remember telling her to again go out to get more vodka and beer, and that he asked her about the vodka when she returned. When he awoke from his sleep later that afternoon, he saw her lying on the floor, but he did not recall talking to the neighbors after that.

During closing argument, defense counsel asserted that defendant's intoxicated state rendered him incapable of forming the intent required for a murder conviction and asked the court to consider voluntary manslaughter. The court noted the evidence of defendant's long and heavy consumption of alcohol and the conflicting testimony on the extent of its effects on him that afternoon. The court then discussed the intoxication defense and whether that factor would bring the case within the purview of the voluntary manslaughter statute. The court stated:

> "Obviously from the facts here we can't see any provocation of the nature which would be required to reduce this case to a lesser-included offense in that the only provocation that has been spelled out is the failure of Ms. Creger to bring back a Vodka bottle. Nonetheless, *** and I suppose drawing more from common law logic and rationale than the statute itself, there is, *** the theory that one could be convicted of man-

slaughter, voluntary manslaughter, because of the presence of the alcohol, drunkenness affecting the ability to form an intent to kill *** and probably more based upon the recognition of human frailties than through the specific requirements of the law."

The court then stated that it was a close case but felt constrained to give defendant the benefit of the doubt. The court entered a finding of guilty on the lesser-included offense of voluntary manslaughter.

Defendant now appeals from that judgment, contending that the conviction for voluntary manslaughter cannot be sustained because the elements necessary to establish that offense were not presented at trial. The State responds that defendant's conviction should be affirmed because the State proved that he was acting under a sudden and intense passion resulting from serious provocation.

■ We note initially that although a defendant is indicted for murder, he may be found guilty of a lesser degree of homicide provided that sufficient evidence exists to sustain the conviction. (*People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897.) Voluntary manslaughter is a lesser-included offense of murder, a legal compromise between murder and exoneration. (*People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.) Thus, a person may be convicted of voluntary manslaughter where the evidence shows that he killed an individual without lawful justification and at the time of the killing was acting under a sudden and intense passion resulting from serious provocation; serious provocation is conduct sufficient to excite an intense passion in a reasonable person. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)(1); *People v. Simpson* (1978), 74 Ill. 2d 97, 384 N.E.2d 331.) Mutual quarrel or combat has been recognized as one of the categories of serious provocation (*People v. Leonard* (1980), 80 Ill. App. 3d 741, 400 N.E.2d 65); however, mere words or gestures, standing alone, are insufficient. *People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 331.

Defendant maintains that there is no evidence that he was acting under a sudden and intense passion resulting from serious provocation and points out that the trial court specifically rejected this theory. On this record, he posits that his conviction cannot stand because the facts support either a murder conviction or acquittal, but not voluntary manslaughter. The State contends that there is ample evidence to support the conviction for voluntary manslaughter based on provocation, relying on the evidence of the couple's drinking habits, their history of mutual abuse and the argument that occurred between them that day. The State also points out that defense coun-

sel argued for a voluntary manslaughter conviction, conceding that there was no doubt that a homicide had occurred and that defendant had committed it.

At the close of evidence, defense counsel argued that because of defendant's drunken state at the time, defendant did not have the specific intent to commit murder and his conduct fell within the ambit of voluntary manslaughter. The court apparently agreed and entered a finding of voluntary manslaughter based on its belief that there was substantial doubt as to whether defendant was capable of forming the requisite intent for murder.

In *People v. Smith* (1984), 124 Ill. App. 3d 720, 464 N.E.2d 824, defendant contended that the trial court erred when it refused to instruct the jury on the included offense of manslaughter because of the substantial evidence in the record of his intoxication. The *Smith* court set forth the provisions of the voluntary manslaughter statute, then held that under this scheme, drunkenness may contribute to a sudden and intense passion or play a part in defendant's mistaken belief of self-defense, but that voluntary intoxication is simply an affirmative defense which alone is an insufficient mitigating factor to reduce the crime of murder to voluntary manslaughter. 124 Ill. App. 3d 720, 723, 464 N.E.2d 824.

■■ ■ Although the trial court apparently felt there was insufficient evidence of provocation to reduce the crime to manslaughter, it entered a finding on the lesser-included offense based on defendant's inability to form the requisite intent because of his intoxicated condition. Under the *Smith* rationale, defendant's intoxicated state would not be a sufficient mitigating factor to reduce the crime to voluntary manslaughter. We bear in mind, however, that a reviewing court is not bound to accept the trial court's reasons for its judgment, and that a judgment may be sustained upon any ground warranted, regardless of whether it was relied upon by the trial court or whether the reasons given were correct. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 457 N.E.2d 9; *People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) After reviewing the record here, we believe there was sufficient evidence to sustain defendant's conviction for voluntary manslaughter despite his argument that he is guilty of murder or nothing at all. *People v. Sykes* (1977), 45 Ill. App. 3d 674, 359 N.E.2d 897.

■■ The essential difference between murder and voluntary manslaughter is the mental state of the accused at the time of the killing; the state of mind involved in voluntary manslaughter based upon provocation has been described as an act of passion or sudden

act of revenge. *People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 405 N.E.2d 1295.

The record here shows that defendant and the victim had been drinking throughout the day, and that when the victim returned from the store without the vodka, defendant struck her face, causing her glasses to fall and her nose to bleed. Within a short time after this incident, Tim Akers heard pummelling noises coming from the kitchen upstairs, and his mother heard a chair fall over and a pounding sound which went on for several minutes before quiet ensued. When Akers heard the disturbance, she remarked to her daughter that it sounded like defendant and the victim were fighting again. Defendant himself testified that when he and the victim would drink heavily, they would fight or quarrel, and he related several instances where he had been injured when the victim struck him with various objects and that he had previously cut her with a knife.

Given the past incidents of drinking, arguing and physical altercations between the pair, defendant's agitation when the victim returned without the vodka that afternoon, the banging and thumping noises coming from the apartment a short time later which were similar to those heard by the neighbors on other occasions during their drinking binges, the alcohol consumed by defendant that day and the nature of the wounds inflicted upon the victim, we believe there was sufficient evidence to support the conclusion that defendant acted under a sudden and intense passion at the time of the stabbing and was properly convicted of voluntary manslaughter.

The judgment of the circuit court of Cook County is therefore affirmed.

Affirmed.

JOHNSON and McMORROW, JJ., concur.