THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CAMELLA LEWIS, Defendant-Appellant.

Fifth District   No. 5—90—0129

Opinion filed June 8, 1992.

HARRISON, J., dissenting.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Bob Haida, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Following a jury trial, defendant, Camella Lewis, was found guilty of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)) for the stabbing and subsequent death of her boyfriend, Louis Jones. Defendant was sentenced to a term of 24 years' imprisonment in the Illinois Department of Corrections.

In this appeal, defendant contends that she was denied a fair trial where the trial court: (1) refused to instruct the jury on second-degree murder based on sudden and intense passion resulting from serious provocation by the deceased; and (2) denied defendant her right to cross-examine a State's witness about charges pending against the witness. We affirm.

At trial, Irvin Duckworth testified that on August 9, 1989, he was drinking beer with the deceased around 5 p.m. when defendant came up and asked the deceased whether he was ready to go home. When the deceased said "No," defendant replied, "When you come home, I'm going to kill you." Duckworth stated that the deceased merely

laughed and did not take the threat seriously, nor did Duckworth, because this was something defendant "always" said during their fights. According to Duckworth, defendant then returned to the residence she shared with the deceased, George Brown, and Brown's girlfriend.

Duckworth further testified that he and the deceased drank beer until around 1 a.m., when they went to Duckworth's residence and had a sandwich. The deceased then left Duckworth's residence, and approximately five minutes later, Duckworth learned that the deceased had been stabbed. When Duckworth arrived at defendant's residence, he heard her saying "Mandingo killed Louis, Mandingo killed Louis." Duckworth testified that he had often seen defendant with a knife, which she carried in her bra. Duckworth admitted that he had been convicted of misdemeanor theft in 1983 and 1985.

Estella Jones, the deceased's sister, testified that around 10:45 p.m. on August 9, she saw defendant and the deceased standing on 14th Street and arguing. Ms. Jones was at her home around 1 a.m. when Duckworth, who lived with her, and the deceased arrived and went to the kitchen to fix sandwiches. On his way out, the deceased knocked on her bedroom door, asked for a cigarette, and stated that he was going home. About 15 minutes later, Ms. Jones received a phone call informing her that the deceased had been stabbed. When Ms. Jones and Duckworth arrived at the deceased's residence, defendant was there with two police officers. Ms. Jones testified that defendant told her that the deceased had gotten into an argument with a man named Mandingo and that when the deceased had pulled a knife, Mandingo had taken the knife away from the deceased and stabbed him and defendant had taken the knife from Mandingo. Defendant had changed clothes since the time Ms. Jones observed her earlier that night.

Ms. Jones testified that defendant and the deceased had been living together approximately two months and that during that time she had heard defendant threaten the deceased as "an everyday thing." Defendant would say things to the deceased like, "I'll kill you." Defendant usually kept a knife in her bra. According to Ms. Jones, the deceased "wasn't a violent type," and she had never seen the deceased abuse defendant when he had been drinking.

George Brown, the deceased's brother, testified that defendant and the deceased had been living at his residence for approximately two months. On the morning of August 10, defendant banged on his door. Defendant was calling Brown's name and saying "Help." Brown looked out his window and saw the deceased lying on the ground with defendant standing by his body. When Brown got outside, he observed

defendant with a knife in her hand and he asked her what had happened. Defendant told him that the deceased had stabbed himself. Brown tried to ask the deceased what had happened, and the deceased pointed his finger at defendant. Brown again asked defendant what had happened, and she told him that three men, one named Mandingo, had stabbed the deceased. Brown saw blood on defendant's hands, her shorts, and the knife; defendant dropped the knife in Brown's yard.

Brown drove the deceased to the hospital, and when defendant later arrived, he told her that the deceased was dead. Defendant then repeatedly said that she "didn't mean to do it." Brown testified that defendant carried a knife in her bra "[e]very day," and that when defendant and the deceased would argue, she often told the deceased that she would kill him. Brown found some of defendant's clothes with blood on them in the bathroom of his house and turned them over to police. Brown admitted that in 1987 he was convicted of two robberies.

Officer Curtis Hill, East St. Louis police department, testified that he was dispatched to 1745 State Street around 1 or 1:30 a.m. on August 10. Upon his arrival, Officer Hill observed a large puddle of blood and a knife on the ground. Officer Hill spoke to defendant, who informed him that her boyfriend had gotten into a fight with two "guys" and that he had been stabbed by a man named Mandingo.

Dr. Harry Parks testified that he performed an autopsy on the deceased. Dr. Parks stated that the deceased suffered one wound at the base of his neck above the left collarbone, which pierced the left common carotid artery and extended down into the upper lobe of the left lung. Dr. Parks testified that death was caused by a combination of massive bleeding and the collapse of the deceased's left lung. People's exhibit 1, the knife found at the scene, was capable of inflicting the deceased's wound. Dr. Parks stated that the deceased's blood-alcohol level, indicated in the toxicology report, was 0.272 milligrams per deciliter of blood.

Detective Marion Hubbard, East St. Louis police department, testified that he interviewed defendant at the police station on August 10 and took a signed two-page statement from her. Detective Hubbard read to the jury the body of defendant's statement:

"I have been staying at 1743 State for about two months with my boyfriend, Louis Jones, and his brother, George, and George's girlfriend. Louis and I would fight all the time. The reason I had the small kitchen knife with me is because I always carried a knife. I carried it for protection because Louis, when he got drunk he always jumped on me. We were coming from about 14th and Columbia Place from his sister's house when we

were arguing. When we got out in front of the apartment building on State Street, Louis slapped me and we got to fighting. When Louis hit me, I had the knife in my hand and it fell on the ground. We were down on the ground wrestling over the knife and I got the knife and I accidentally stabbed him. I don't know where I stabbed him at. There was a lot of blood on me and Louis was on top of me, so I got him off of me and then I called George for help, who was upstairs in the apartment. When George came down I told him that Mandingo and three more dudes had jumped him. George picked up Louis and put him in the car and took him to the hospital. I went upstairs and washed the blood off of me and I changed shorts because they had blood on them. Then I walked to Community Hospital. When I got there George told me that Louis was dead. I thought he was playing. I told him, [']Why don't you quit lying,['] and the police officer told me to get into the car. We drove back to the apartment building first and then the police officer arrested me and took me to jail.

I did not mean to kill Louis. I did not know he was dead until later."

Defendant testified that she had been involved with the deceased for approximately four months and had been living with him at George Brown's residence for about two months. Defendant testified that the deceased "was nice until he started drinking," and then he became "very violent" and liked to argue and fight. Defendant stated that the deceased had previously threatened her during these arguments, once drawing a two-by-four board on her and another time breaking a glass and trying to cut her with it, but both times she had run away. Defendant testified that she carried a knife for protection from the deceased because she was afraid of the deceased when he was intoxicated.

On the evening of August 9, defendant and the deceased had gone to an apartment complex at Columbia Place. Defendant stated that while they were there, she drank one beer and the deceased drank several beers. Duckworth and the deceased drank together all evening, and defendant knew the deceased was drunk. Upon leaving, defendant and the deceased went to his sister's house, and the deceased went in, got a cigarette, and came out. On the walk home, the deceased began arguing with defendant and slapped her. Defendant testified that they had reached the front of their apartment when the deceased

"started hitting on me [*sic*] and I pulled my knife and it fell and I fell down and I got the knife and he was choking me and I tried to get him off of me, so I cut him with the knife and I seen

[*sic*] blood and I got him up off of me and I went upstairs, told George to call the police and the ambulance because I needed some help."

Defendant stated that she originally told Brown a different story because he "was talking about jumping on" her and she was afraid of him. After the deceased was taken to the hospital, defendant went upstairs, wiped off some of the blood, put on old clothes, and ran to the hospital. Defendant stated that she did not intend to kill the deceased, but that she was scared and was "just trying to get him off me because he was choking me very hard." Defendant denied ever threatening the deceased and denied pulling the knife before their fight began.

Dr. Christopher Long testified that he operates the forensic toxicology laboratory at St. Louis University. Dr. Long's laboratory received and analyzed the deceased's blood sample and found it to contain 0.272 grams of alcohol per 100 milliliters of blood. Dr. Long stated that a blood-alcohol level between .20 and .30 was indicative of "very heavy alcohol consumption" and that the deceased's level of .27 could reasonably be described as "pretty drunk."

At the jury instructions conference, defense counsel tendered instructions concerning second-degree murder based on "serious provocation" (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(1); Illinois Pattern Jury Instructions, Criminal (hereinafter IPI Criminal), Nos. 7.03A, 7.04A (2d ed. 1989 Supp.)), second-degree murder based on an "unreasonable" belief in the need for self-defense (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2); IPI Criminal 2d, Nos. 7.05A, 7.06A (1989 Supp.)), and involuntary manslaughter based on an act performed "recklessly" (Ill. Rev. Stat. 1989, ch. 38, par. 9—3(a); IPI Criminal 2d, Nos. 7.07, 7.08). The State argued that both forms of mitigation in second-degree murder could not be presented to the jury because "[t]hey're not logically or legally consistent." The prosecutor further contended: "I don't think a defendant can have both theories. They have to elect which they're going to go under. Is the defendant acting under serious provocation or does the defendant think [she's] acting in self-defense?"

The trial court originally ruled that the jury would be given instructions on both forms of second-degree murder but later reversed its decision and ruled that both forms of mitigation could not be presented to the jury. The court then refused defendant's tendered instructions on second-degree murder based upon provocation. Defendant contends that the trial court's rejection of these instructions constituted reversible error. We do not agree.

In 1987, the Illinois General Assembly amended the Criminal Code of 1961 (Code) and replaced voluntary manslaughter with second-de-

gree murder. However, the case law involved pertaining to voluntary manslaughter and murder under the old law is applicable to first-degree murder and second-degree murder under the new law. See *People v. Johnson* (1991), 215 Ill. App. 3d 713, 727-29, 575 N.E.2d 1247, 1256-57 (appellate court, when deciding whether trial court in first-degree murder case abused its discretion by refusing defendant's offer of second-degree murder instructions based upon "serious provocation," considered five cases dealing with "serious provocation," all of which were decided under the old voluntary manslaughter statute).

If there is any evidence in the record which, if believed by the jury, would reduce a charge of murder to manslaughter, a manslaughter instruction tendered by the defendant must be given. (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, 415 N.E.2d 358, 363.) Moreover, when there is evidence in the record to support "unreasonable belief" voluntary manslaughter as well as "provocation" voluntary manslaughter, the court must give instructions on both. (See *People v. Craven* (1973), 54 Ill. 2d 419, 425-26, 299 N.E.2d 1, 4-5; *People v. March* (1981), 95 Ill. App. 3d 46, 54, 419 N.E.2d 1212,1218 (it is permissible to instruct the jury as to both types of voluntary manslaughter).) Therefore, although the trial court in the case at bar erroneously concluded that it could not instruct the jury on both forms of second-degree murder, the error is only prejudicial to defendant if the evidence of record supported both theories.

A defendant in a criminal case is entitled to have the jury consider any legally recognized defense which has a foundation, however tenuous, in the evidence. (*People v. Robinson* (1989), 189 Ill. App. 3d 323, 349, 545 N.E.2d 268, 286.) A "provocation" voluntary manslaughter instruction is warranted where the evidence indicates that the defendant acted as a result of sudden and intense passion resulting from provocation. (*People v. Ford* (1987), 163 Ill. App. 3d 497, 502, 516 N.E.2d 766, 770.) Mutual quarrel, combat, or assault is evidence of adequate provocation to require a voluntary manslaughter instruction. *Robinson*, 189 Ill. App. 3d at 349, 545 N.E.2d at 286.

When mutual combat occurs immediately preceding or during the infliction of death, the voluntary manslaughter instruction may not be refused, even if the defendant was the aggressor at the outset. Nor may the instruction be validly refused on the ground that there was evidence that defendant's intent to kill was formulated at an earlier time, if there is evidence that the defendant's criminal intent may have arisen during or out of the heat of the altercation. (*Robinson*, 189 Ill. App. 3d at 349-50, 545 N.E.2d at 286; see also *Leonard*, 83 Ill. 2d at 420-23, 415 N.E.2d at 358.) The instruction is required even if the evi-

dence of mutual combat is only a momentary scuffle. (*Robinson*, 189 Ill. App. 3d at 350, 545 N.E.2d at 286; see also *March*, 95 Ill. App. 3d at 54, 419 N.E.2d at 1218.) Accordingly, where there is sufficient evidence of mutual combat in the record, it is reversible error to refuse such an instruction. *Johnson*, 215 Ill. App. 3d at 728, 575 N.E.2d at 1257.

■ In the instant case, there is no evidence which warranted the giving of a second-degree murder instruction based on serious provocation. The record shows that the deceased had been drinking throughout the evening and, considering his blood-alcohol level, was extremely drunk. Defendant testified that when the deceased drank he would get very violent and "jump on" her, and that she carried a knife for protection against defendant. Several State's witnesses confirmed that defendant and the deceased argued regularly, and defendant testified that during previous arguments deceased had threatened her, once with a board and once with a broken glass. Defendant testified that the deceased "started hitting *** me and I pulled my knife and it fell and I fell down and I got the knife and he was choking me and I tried to get him off of me, so I cut him with the knife."

Defendant's written statement also mentioned that she frequently fought with the deceased and that her fear of the deceased was her reason for carrying a knife. Defendant's statement indicated that at the time the deceased was stabbed, the two were fighting and "were down on the ground wrestling over the knife." Evidence that not only defendant's hands but also her shorts were bloodstained is consistent with her claim that the stabbing occurred during a struggle or combat with the deceased.

Given the relevant facts of this case, we believe *People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 405 N.E.2d 1295, is controlling. In *Slaughter*, the reviewing court found that the trial court's decision not to give an instruction on "provocation" voluntary manslaughter was proper because the defendant had consistently testified that his actions were defensive and motivated by fear and the desire to escape from the victim. The testimony of the defendant in the present case likewise demonstrates that her actions were motivated by fear of the deceased and were defensive in nature. Although defendant and the deceased struggled, there is nothing to indicate that defendant willingly participated in the struggle. To warrant a "provocation" instruction based upon mutual combat, the struggle must be *mutual*. Struggling with an attacker in an effort to ward off or defend one's self against an assault is not sufficient to warrant a provocation instruction. As in *Slaughter*, the record in the present case is "devoid of evidence that defendant

acted under sudden and intense passion due to provocation" at the time of the stabbing. 84 Ill. App. 3d at 1109, 405 N.E.2d at 1301.

Defendant next argues that her right to cross-examine a State's witness was improperly restricted when the trial court refused to allow defense counsel to question George Brown about his pending residential burglary charge. We do not agree.

The sixth amendment to the Federal constitution protects the defendant's right of cross-examination, and the defendant should be allowed a wide latitude to show bias. (*People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261, 267-68, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 361; *People v. Paisley* (1986), 149 Ill. App. 3d 556, 560, 500 N.E.2d 96, 98-99.) The pending charges of a witness are admissible to show that his testimony might be influenced by bias, interest, or a motive to testify falsely. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475, 485 N.E.2d 9, 15.) Cross-examination for this type of impeachment is a matter of right subject only to the trial court's broad discretion to preclude repetitive or unduly harassing interrogation and to confine the cross-examination to proper subject matter. *Paisley*, 149 Ill. App. 3d at 560, 500 N.E.2d at 99; see also *Triplett*, 108 Ill. 2d at 475, 485 N.E.2d at 15.

■ In the case at bar, defense counsel, during cross-examination, asked State's witness George Brown whether he was "currently being charged for another offense." The State objected and moved for a mistrial, arguing that no "deals" had been made with the witness and that evidence that the witness was charged with an offense was irrelevant unless there was evidence of a deal. Arrests or charges to be used against a witness

> "must give rise to the inference that the witness has something to gain or lose by his testimony. [Citation.] In other words, the State must have some 'leverage' over the witness." *Triplett*, 108 Ill. 2d at 481-82, 485 N.E.2d at 18.

Although the defendant does not have to show prior to examining the witness that the witness has been promised leniency or expects to receive favorable treatment (*Triplett*, 108 Ill. 2d at 476, 485 N.E.2d at 15), the State's Attorney's affidavit demonstrates that defense counsel knew *before trial* that no "deals" had been made. Further, because there was no offer of proof demonstrating that the evidence excluded had a positive and direct bearing on the issue of bias or motive to testify falsely, it was not error for the trial court to foreclose this line of inquiry. *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 502 N.E.2d 304.

Based upon the foregoing, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

H. LEWIS, J., concurs.

JUSTICE HARRISON, dissenting:

I decline to join in the majority's opinion in this case because I believe there was sufficient evidence presented at trial to warrant the giving of a second-degree murder instruction based on serious provocation. Although the majority admits that where there is evidence of mutual combat in the record it is reversible error to refuse such an instruction (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 728, 575 N.E.2d 1247, 1257), it concludes that the combat was not mutual because "there is nothing to indicate that defendant willingly participated in the struggle." (229 Ill. App. 3d at 881.) However, mutual combat is defined as a fight or struggle which both parties enter willingly *or* where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. *People v. Austin* (1989), 133 Ill. 2d 118, 125, 549 N.E.2d 331, 334; *People v. Burks* (1981), 103 Ill. App. 3d 616, 621, 431 N.E.2d 1085, 1088.

As the majority notes, the record shows that at the time of the incident, the deceased was extremely drunk. Defendant testified that when the deceased drank he would get very violent and that the two frequently argued and fought when he drank. Defendant's written statement indicated that the two had been arguing, that the deceased slapped her, that they began fighting and "were down on the ground wrestling over the knife" when the deceased was stabbed. Similarly, in *Burks*, the reviewing court held that there was sufficient evidence to find the defendant had committed voluntary manslaughter based on serious provocation where an argument erupted which escalated into a physical assault and ended with the victim being stabbed. (103 Ill. App. 3d at 620-21, 431 N.E.2d at 1088.) Given the past incidents of drinking and arguing between the pair, and the evidence that such an argument escalated into mutual combat at the time of the stabbing, an issue of fact existed as to whether defendant was provoked. See *People v. Dare* (1986), 140 Ill. App. 3d 413, 420, 488 N.E.2d 1304, 1308-09; *Johnson*, 215 Ill. App. 3d at 728, 575 N.E.2d at 1256-57.

The majority cites *People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 405 N.E.2d 1295, as controlling because here, as in *Slaughter*, the defendant testified that her actions were defensive and motivated by

fear of the deceased. However, a defendant's testimony that he acted in self-defense does not negate his right to a manslaughter-provocation instruction. (*People v. Ford* (1987), 163 Ill. App. 3d 497, 503, 516 N.E.2d 766, 770.) Furthermore, where the court in *Slaughter* admitted that the defendant's testimony that the victim grabbed him and choked him before the fatal stabbing "could constitute serious provocation," its conclusion that the record was "devoid of evidence that defendant acted under sudden and intense passion due to provocation" is totally incongruous and should not be followed. *Slaughter*, 84 Ill. App. 3d at 1109, 405 N.E.2d at 1301.

The record herein contained evidence which could support the conclusion that defendant acted under sudden and intense passion at the time of the stabbing. The trial court's failure to instruct the jury on second-degree murder based on provocation precluded defendant from obtaining the jury's consideration of this theory, despite the evidentiary basis for it. This error requires reversal of defendant's conviction and remandment of the cause for a new trial. See *People v. Barnes* (1982), 107 Ill. App. 3d 262, 267-68, 437 N.E.2d 848, 852.

I also disagree with the majority's conclusion that it was not error for the trial court to deprive defendant of her right to cross-examine a State's witness about his pending felony charge. Although the State's Attorney's affidavit represents that no "deals" had been made with the witness, this fact does not preclude inquiry as to the pending charge because, as the majority concedes, defense counsel need not show beforehand that any promises of leniency have been made or that any expectations of special favor exist in the mind of the witness. (*People v. Triplett* (1985), 108 Ill. 2d 463, 476, 485 N.E.2d 9, 15.) Further, counsel is entitled to inquire into such promises or expectations whether based on fact or imaginary. (108 Ill. 2d at 476, 485 N.E.2d at 15.) Rather, the only requirement when impeaching by showing bias, interest or motive is that the evidence used must not be remote or uncertain and must give rise to the inference that the witness has something to gain or lose by his testimony. (108 Ill. 2d at 475-76, 485 N.E.2d at 15.) Here, the evidence was not remote or uncertain. The record shows that the witness had a pending residential burglary charge, and the existence of this charge gave rise to the inference that the witness had something to gain or lose by his testimony. Thus, the fact that no "deals" had been made should not have prevented inquiry into the witness' pending charge, where that information's only relevance was to rebut the inference arising from that charge.

The majority further argues that no error occurred in foreclosing this line of inquiry where there was no offer of proof "demonstrating

that the evidence excluded had a positive and direct bearing on the issue of bias or motive to testify falsely," citing *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1082, 502 N.E.2d 304. However, in *People v. Paisley* (1986), 149 Ill. App. 3d 556, 500 N.E.2d 96, also cited by the majority, the court held that despite a witness' testimony during an offer of proof that he had not entered negotiations with the State regarding his pending charges and had not been promised or led to believe that his testimony would affect his treatment in his case, evidence of his pending charges should have been presented where it would have shown possible bias in his testimony resulting from a desire to affect his treatment in *future* negotiations on the charges. 149 Ill. App. 3d at 561, 500 N.E.2d at 100.

The United States Supreme Court has declared that revealing a witness' possible biases, prejudices or ulterior motives was "a proper and important function of the constitutionally protected right of cross-examination." (*Davis v. Alaska* (1974), 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110.) In *Davis*, the defendant was precluded from cross-examining a witness regarding his probationary status and hence his possible bias. The Court concluded:

> "[I]t seems clear to us that to make *** inquiry [into the witness' credibility] effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliance of the witness. [The defendant] was thus denied the right of effective cross-examination which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Brookhart v. Janis* [(1966)], 384 U.S. 1, 3[, 16 L. Ed. 2d 314, 316, 86 S. Ct. 1245, 1246].' *Smith v. Illinois* [(1968), 390 U.S. 129, 131, 19 L. Ed. 2d 956, 959, 88 S. Ct. 748, 750.]" *Davis v. Alaska* (1974), 415 U.S. 308, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111.

The *Davis* Court's rationale was followed by our supreme court in *Triplett* (108 Ill. 2d at 479-86, 485 N.E.2d at 17-20), and I believe it is equally applicable in the instant case. Thus, because I believe reversible error to have been committed, I would remand for a new trial.