THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK STEPHENSON, Defendant-Appellant.

First District (4th Division) No. 1—89—2497

Opinion filed April 18, 1991.

LINN, J., dissenting.

Julius Lucius Echeles, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Julian J. Frazin, Special Assistant State's Attorney, and Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a bench trial, the defendant Mark Stephenson was found guilty of murder and sentenced to 20 years' imprisonment. On appeal, the defendant argues that he was not proved guilty beyond a reasonable doubt and that his conviction should be reduced to involuntary manslaughter or second degree murder.

The evidence produced at trial was as follows. Jane Taylor, who lived next door to the decedent at 8155 South Dante in Chicago, testified that about 6:30 p.m. on May 24, 1987, she heard a sound that "might have been a firecracker or a gun." She walked outside to investigate and observed the decedent, Deleria Renee Rice, lying on the floor of the porch of the second-floor apartment which the decedent shared with the defendant. The decedent was bleeding profusely and a shotgun was next to her body. Taylor testified that she had known the defendant since he was a youth and that he had a good reputation in the community.

Detective Michael Baker testified that he responded to a radio call that a woman had been shot. By the time he arrived at the scene the body had been removed, but he observed a large amount of blood and a 20-gauge shotgun which was subsequently processed by the crime laboratory. An inspection of the premises revealed a porch with outside and inside doors that were both open. The inside door had metal mesh around the windows and one of the windowpanes was broken. The outside screen door was open. Blood and portions of the decedent's brain were found on a wall and on the inside of the outer door, about five feet towards the top of the door. Brain matter was also found in the backyard. A box containing five shotgun shells and a seven-page note written by the decedent were found in a bedroom.

The note was admitted into evidence. In her note the decedent referred to her love for the defendant and her happiness when the defendant asked her to marry him. She also wrote of their personal and financial problems stemming from their use of cocaine, and she expressed concern that they would kill each other over cocaine. She then indicated that she was terminating the relationship and asked the defendant to bear with her until September 1 so she could find a job and support herself. The decedent stated that if the defendant would not allow her to stay until then, she could stay with relatives. The decedent expressed her intention to ultimately return to her home in Memphis, Tennessee. The decedent also expressed her hope that the defendant would straighten out his life.

Further inspection of the apartment revealed that several rooms were in disarray, two pieces of open luggage containing clothing were on a bed and a television set was in the hallway between the bedrooms and the kitchen. Detective Baker identified photographs taken at the scene. Photographs of a table in the living room depicted a glass, pipes, spoons, powder and liquid which the detective identified as items used for "freebasing cocaine." Another photograph depicted a video cassette recorder (VCR) on the back porch.

Detective Baker testified that after he had been at the scene for several hours, he was contacted by the defendant's relative, who told Baker that the defendant wanted to surrender. Baker proceeded to the relative's apartment where he met the defendant, advised him of his rights and took him to the police station where the defendant was again advised of his rights, which he stated that he understood. The defendant then agreed to talk to the police. According to Baker, the defendant told him that he and the decedent had been arguing about her moving into the basement apartment, and he told her that he did not want her to move. As they were watching television, the decedent got up, took the VCR and walked outside with it. The defendant went to retrieve it, and as he was bringing it inside, the decedent approached him carrying a gun. They struggled and broke a windowpane in the rear door. As they continued to struggle, the gun discharged and the decedent fell on the porch floor. The defendant then called to his mother to summon the police.

Edwina Stephenson, the defendant's mother, testified that she was in her apartment, which was located across the street from where her son lived, when she heard a loud noise, went to her backyard and saw the defendant standing on the porch. She did not see anything in his hands. The defendant told her to get help, and she called the police. When she finished, she saw the defendant on the

kitchen floor of her apartment kneeling and praying "saying he hoped she lived and I don't want anything to happen and say [sic] things like that he was incoherent." After she told the defendant to go back to the decedent and help her, the defendant left, and she next saw him in court the following day. According to Mrs. Stephenson, the defendant and the decedent had lived together for more than one year.

Mrs. Stephenson testified that about one month after the incident the defendant told her what happened. She stated that the defendant told her that he had been lying on a couch when the decedent started fighting with him. The defendant then ran into the bathroom and locked the door. When he came out about 20 minutes later, he observed the decedent moving his belongings onto the porch, including a stereo, VCR and television. The decedent got the gun and the two began wrestling, during which the defendant pushed the decedent out of the door and onto the back porch. According to Mrs. Stephenson, the defendant told her that "the gun had got stuck up inside of the kitchen window part of the door." The defendant then locked the door. While the decedent was on the porch banging on the door, glass broke. Mrs. Stephenson stated that the next thing the defendant told her was that, "at the time she [the decedent] was banging on the door and then he [the defendant] heard a swish noise and so he did not hear her any more and he opened the door and there she was." When questioned as to whether the defendant told her if he pulled the trigger and if he told her what caused the gun to discharge, Mrs. Stephenson stated that the defendant told her that he did not pull the trigger and the gun discharged because of the decedent's banging and kicking on the door.

On cross-examination, Mrs. Stephenson testified that on the day of the incident the decedent and the defendant had a conversation in Mrs. Stephenson's presence concerning the decedent's desire to move into the basement apartment because it would be cheaper to live there. The defendant indicated that he did not want to move, that he would probably get a job and they would not need to move. The decedent left, and the defendant followed about 30 minutes later. Mrs. Stephenson testified that the defendant did not own the shotgun and that the decedent had told her that she owned it. Mrs. Stephenson testified that, a year before the incident, the defendant asked her to come to his apartment because the decedent was fighting with him and he had to call the police. Although the defendant had said nothing about a gun that day, three days later he told his mother that the decedent had threatened him with a gun.

Dr. Michael Chambliss testified concerning the autopsy he performed on the decedent. He concluded that she died from a gunshot wound to the head. He observed a "large, gaping shotgun injury to the top of the head." He testified that because of the presence of "scalloped margins" and "wadding abrasions" on the wound, he could estimate that the decedent was shot from a distance of three to five feet, and that the angle of the gun at the time it was fired was such that the gun was in a horizontal position and level with and pointed directly at the decedent's forehead. When asked if he could determine the direction the decedent's brain matter would go upon the shotgun being discharged into her skull, Dr. Chambliss responded:

> "Once a shotgun wound or injury enters the head, itself, you have a shattering of not only the outer bone, itself, but the brain within the skull and it can go up sideways any direction that is not impeding the course of the injuries, both bone and brain."

Police officer Richard Fournier was an expert in the field of firearms and firearms identification. He identified the weapon that was used in the shooting as a "twenty gauge single action break open shotgun." He indicated that the weapon had a safety mechanism he referred to as a transfer bar safety, and that the gun would not fire unless "you cock the hammer back, pull the trigger fully to the rear and then let the hammer fall." With regard to the defendant's contention that he did not pull the trigger and that the gun just "went off," Officer Fournier testified as follows on direct examination by the State:

> "Q. Pull[ing] the trigger by itself will not discharge this weapon?
>
> A. Well, it would depend how you did it, but if you broke the hammer and let go immediately, the trigger would move forward and you can see as you break it, the trigger moves forward and that trigger moves forward, the transfer bar drops down immediately, preventing it from firing. .
>
> Q. Okay.
>
> A. The purpose of that transfer bar safety is to prevent accidental discharge.
>
> .Q. With that hammer pulled back in the manner I have it right now, is there any external impact force that could cause that gun to fire?
>
> A. I would say you could probably apply enough force to jar the hammer loose so it would fall forward, but as that hap-

pened, the trigger would also fall forward and the transfer bar would immediately drop out of place.

Q. The gun would not fire?

A. The gun would not fire.

In order for the gun to fire, the hammer has to fall while the trigger is held fully to the rear.

Q. So, in other words—

A. To keep that transfer bar, you see, if you hold the trigger to the rear, the transfer bar stays up, so the hammer hits it and that transfer bar, then, in turn, hits the firing pin.

Q. To fire the gun, the trigger has to be pulled?

A. With that particular weapon, yes.

Q. With the hammer back and the trigger not pulled, is there any impact that could cause that gun to fire?

A. In my opinion, in the condition that gun is in, I examined the weapon, found no defects in it, I would say no."

On cross-examination, Officer Fournier testified that he tested the gun to determine if it worked properly under normal circumstances, and that he did not repeatedly apply pressure while the gun was in a cocked position to see if it would discharge. On redirect examination, he testified that he performed a "trigger pull test" and determined that it took more than a normal amount of pressure on the trigger pull to cause the gun to discharge.

The defendant's cousin, Derrick Far, testified that the decedent pulled a shotgun on him on two separate occasions when he was at the defendant's apartment. On one occasion, the defendant and the decedent were "getting high" and the decedent accused Far of selling her bad cocaine, and on the other occasion, she pulled a gun during a "drug related" transaction.

Lanse Martin, another cousin, testified that he lived in the basement apartment of the same building where the defendant and the decedent shared the second-floor apartment. He stated that before the decedent moved in with the defendant he never saw a gun in his apartment, but after the decedent moved in she pulled a gun on Martin several times so that he stopped going to their apartment and that he moved out of the building about two weeks before the incident. About two days before he moved out, the decedent came down to his apartment carrying the shotgun and, according to Martin, told his girlfriend, "This is how you take care of him if he gives you any trouble," and then showed Martin's girlfriend how to load the gun. He also recounted an incident concerning a jacket the defendant had loaned Martin. He testified that when he went to the defendant's

apartment to return it, the decedent answered the door with the gun and said, "Where is the jacket[?] You ain't getting in here unless you have the jacket."

Thomas Stephenson, the defendant's father, testified that the defendant never owned a gun. He stated that at the time of the shooting he was at the building where the defendant lived installing locks on the basement apartment so that the defendant and the decedent could move into it. He testified that sometime after 5 p.m. he heard a commotion upstairs and the decedent kicking on the door. When he went to investigate, he saw the decedent standing on the porch "starring [sic] glassy eyed looking toward Stoney Island." Her gun was nearby. Mr. Stephenson called to her, and when she failed to respond, he went back downstairs to finish his work. About 20 minutes later, he heard a gunshot and his son saying, "Oh, God; oh, God! What happened?" When Mr. Stephenson ran up to the landing, he saw the decedent lying facedown with the gun near her. The next day he returned to clean the area where the shooting occurred. While doing so he observed portions of the decedent's "skull and hair hanging from the rafter." He photographed the area. In court he identified a photograph depicting shotgun pellets and the decedent's hair on the ceiling of the porch. He also identified a photograph of a storm door that led from the kitchen of the apartment to the porch. The picture revealed blood and brain matter on the door and a broken pane of glass. Mr. Stephenson testified that the blood and brain matter were toward the top of the door, "all the way up."

The defendant testified that he had known the decedent for about two years prior to the shooting and that they lived together in the apartment. Although he described their friendship as a "loving relationship," he stated that their mutual use of cocaine caused problems in their relationship. He testified that on the day of the incident he and the decedent had a dispute at his mother's house about moving into the basement apartment. There were apparent financial problems as a result of both parties having lost their full-time jobs. The decedent went back to their apartment, and the defendant remained at his mother's house for about 20 minutes. When he returned to his apartment, he did not have his keys, so he knocked on the door for about 15 minutes before the decedent opened the door. The defendant entered the apartment, went into the dining room, lay down on a couch and watched television. A few minutes later, the decedent entered the room, jumped on him and started beating him. According to the defendant, he weighed about 145 pounds and the decedent weighed about 190 pounds. The defendant broke away and proceeded to lock

himself in the bathroom, hoping that the decedent would calm down. About 20 minutes later, he came out and saw the decedent putting his belongings on the porch. He started to move his things back inside when the decedent fought with him about the television. The defendant put the television down in the hallway and told the decedent to stop moving out his things. The defendant went to the porch, and as he was going back inside the apartment, he saw the decedent in the kitchen with her gun. The defendant testified that the gun belonged to the decedent, that her grandfather had given it to her and that she brought it with her when she moved in with the defendant. According to the defendant, as he and the decedent wrestled in the kitchen, the gun caught on the "window guard on the back door," which was located near the door knob and lock. At that point, the defendant pushed the decedent out the door and locked it. The defendant stated that he stood back as the decedent kicked and banged on the door for nearly 10 minutes, breaking the door's windowpanes. Then, "all of a sudden the gun made this whoosh sound," "like scraping metal" and went off. The defendant pulled out the gun and opened the door. He saw the decedent lying on the ground and coughing. The defendant stated that he became hysterical and started to scream. When his father appeared on the scene, he ran to his mother's house and told her to call the police because the telephone in his apartment was broken. The defendant returned toward his apartment, and as he got to the building, he saw the police, his father and several other people. His father told him to return to his mother's apartment and compose himself. The defendant did so. When he came back outside a while later, he saw paramedics removing the decedent. He then walked to a nearby hospital to see if the decedent was there, but was told that she was not. He next walked a few blocks to his grandmother's house to make some telephone calls to find out where the decedent had been taken. His aunt told him to call the police. He agreed and she made the call. The police arrived a while later.

The defendant recalled that about six months before the incident he and the decedent had a fight during which she took out the gun. On that occasion, the defendant called the police and his mother. However, before the police arrived he decided that he did not want to cause the decedent any trouble, and when the police arrived, he did not tell them about the gun. The defendant also recalled an incident that occurred about two weeks before the shooting. According to the defendant, two men were trying to rob a third man in an alley behind their apartment building. The decedent took the gun, went into the alley and stopped the assailants. The defendant also testified that he

was present in their bedroom on one occasion when the decedent pulled the gun on Derrick Far and his friend.

In rebuttal, the State called Detective Adeline Raducha. She testified that she interviewed Derrick Far and Lanse Martin on the evening of the shooting, and both men never told the detective that the decedent had ever displayed or pulled a gun on them.

Another rebuttal witness, Detective Joseph Danzl, testified that during his inspection of the crime site he observed that one of the windowpanes on the back door leading to the porch was broken, that the broken glass was found on the kitchen floor and that there was no broken glass found on the door's threshold or on the porch. On cross-examination, Detective Danzl stated that during grand jury testimony he indicated that the defendant told him that prior to the shooting he and the decedent argued and the decedent told him she was going to leave. During the ensuing struggle with the decedent, he shot her once in the head.

In finding the defendant guilty, the trial court stated:

"Case turns a great deal on the testimony of the defendant. And I find that testimony unbelievable. Testimony of Dr. Michael Chamblis [sic] and Richard Fournier, the Chicago Police Department Firearms Technician, clearly proves it could not have happened in the way the defendant described it. That was the rest of his testimony and his actions after the death of this young girl, makes me find that the evidence proves the defendant guilty beyond all reasonable doubt."

The defendant first contends that the evidence failed to prove him guilty beyond a reasonable doubt of murder. Specifically, the defendant challenges the testimony of Dr. Chambliss and Detective Fournier, whose testimony was relied on by the trial court when finding the defendant guilty. Regarding the testimony of Dr. Chambliss that the gun must have been in a horizontal position and at the level of the decedent's forehead when it discharged, the defendant points out that Dr. Chambliss was not a ballistics expert. Regarding Detective Fournier's testimony that the gun could not have gone off without the trigger being pulled, the defendant notes that the detective testified that he did not test the gun's safety device. The defendant adds that the State's version of the incident fails to take into account the evidence that portions of the decedent's brain, hair and scalp were found on the ceiling of the porch.

■■ In determining the issue raised by the defendant, we are guided by the general rule of law that a court of review will not substitute its judgment for that of the trier of fact on questions involving

the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence, when viewed in a light most favorable to the prosecution, is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) The murder statute in existence at the time of the offense provided that a person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death, he either intends to kill or knows that such acts will cause death to that individual, or he knows that such acts create a strong probability of death. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).

The trial court found Dr. Chambliss to be a credible witness who testified that the gun was held at shoulder level, pointed at the decedent's forehead and fired at an estimated distance of three to five feet. His testimony suggests that the decedent was shot after the defendant had gained control of the gun, stepped several feet away from the decedent, aimed it and pulled the trigger. The testimony supported the trial court's determination that the defendant was guilty of murder. We will not substitute our judgment for that of the trial court.

The defendant argues in the alternative that this court should reduce the conviction to either involuntary manslaughter or second degree murder.

A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter "if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1989, ch. 38, par. 9—3.) In arguing that the evidence justifies at most a conviction for involuntary manslaughter, the defendant relies upon his testimony that he never shot the gun, never pointed it at the victim and was struggling with the victim over the gun. As stated earlier, the trial court specifically rejected the defendant's testimony as unbelievable. Under these circumstances we find no basis upon which to reduce the conviction to involuntary manslaughter.

The defendant's argument that the conviction should be reduced to second degree murder must also fail. The second degree murder statute was not in effect at the time the offense was committed. (See Ill. Rev. Stat. 1989, ch. 38, par. 9—2.) Second degree murder was formerly codified as voluntary manslaughter. (*People v. Pirrello* (1991), 207 Ill. App. 3d 208, 565 N.E.2d 324.) A person who killed an individual without lawful justification committed voluntary

manslaughter if at the time of the killing he was acting under a sudden and intense passion resulting from serious provocation by the individual killed. Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).

Although there was some evidence in the case at bar suggesting provocation on the part of the decedent, the evidence also tended to negate the claim that the provocation caused the defendant to shoot her. (See *People v. Calhoun* (1987), 152 Ill. App. 3d 206, 504 N.E.2d 266 (provocation was not cause of fatal stabbing where defendant and victim were engaged in mutual combat, broke apart and walked several feet away before defendant ran at victim and stabbed him).) The presence of provocation does not as a matter of law preclude a conviction for murder. The crime is murder when a defendant attacks a victim with violence all out of proportion to the provocation, and this is especially true if the homicide is committed with a deadly weapon. (*People v. Austin* (1989), 133 Ill. 2d 118, 127, 549 N.E.2d 331.) In our opinion, the crime committed in the instant cause was murder and we therefore decline to reduce the conviction to voluntary manslaughter.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McMORROW, J., concurs.

JUSTICE LINN, dissenting:
I respectfully dissent because I believe that, on the whole, the evidence is insufficient to support a conviction for murder. I would reduce the conviction to voluntary manslaughter and remand for resentencing pursuant to Supreme Court Rule 615(b)(3) (107 Ill. 2d R. 615(b)(3)).

Voluntary manslaughter requires a conclusion that at the time of the killing the accused was acting under a sudden and intense passion resulting from serious provocation by the individual killed. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).) Reviewing courts do not lightly set aside a trial court's judgment that is based on the weight of the evidence and credibility of the witnesses (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461); however, there are a number of undisputed facts in this case that are not inherently implausible and which, I believe, support a finding of voluntary manslaughter.

During the day of the shooting, the defendant and his girlfriend had been arguing heatedly. Both were cocaine abusers, and this had affected their ability to keep their jobs at a bank and to function rationally. Defendant's father testified that about one-half hour before

the shooting he saw the decedent standing on the porch, holding the gun, appearing "glassy-eyed" and unresponsive to the father's calls to her. Defendant testified that the decedent physically attacked him as he lay on the couch and that he had locked himself in the bathroom to evade her and let her cool down. The record shows that the decedent outweighed him by about 45 pounds. The fight continued as the decedent moved defendant's belongings out onto the porch and he asked her to stop. Defendant was moving his things back into the apartment when she confronted him with the shotgun. The two struggled and, at some point, the gun discharged. Several defense witnesses testified that the decedent was the owner of the shotgun and that she had threatened others with the weapon on different occasions. After the shooting, defendant became hysterical and summoned help from his parents, but left before the police arrived. He turned himself in to the police shortly thereafter.

It is true that the trial court rejected defendant's testimony in favor of the State's witnesses. Nevertheless, the portion of defendant's testimony that the court found incredible concerned the statement that the gun was stuck in the door and discharged when decedent kicked and beat on the door, not the events leading up to the fatal shooting. The trial court put considerable weight upon the testimony of Dr. Chamblis and Detective Fournier, finding that their evidence "clearly proves it could not have happened in the way the defendant described it." Dr. Chamblis, who admitted that he is not a ballistics expert, testified that in his opinion the gun must have been in a horizontal position and held at the level of the victim's forehead when it discharged. It would seem, however, that the location of some of the victim's brain matter, hair and scalp—on the ceiling of the porch—is at least consistent with defendant's testimony that the gun went off while pointing up at an angle. Detective Fournier admitted that when he performed tests on the shotgun, he did not test the gun's safety device, to determine whether the gun would discharge if pressure was applied to it while it was in a cocked position.

I believe that the evidence of what occurred before (and even just after) the actual shooting establishes the mitigating mental state of voluntary manslaughter based on sudden and intense passion resulting from serious provocation. (See, *e.g., People v. Dare* (1986), 140 Ill. App. 3d 413, 488 N.E.2d 1304 (Evidence that accused and his common-law wife were alcoholics who fought when they drank and that they did so shortly before thumping and banging sounds were heard in apartment where witnesses discovered stabbed victim warranted trial court's conclusion that accused was acting under sudden and in-

tense passion resulting from serious provocation at time of fatal stabbing).) In *Dare*, the appellate court affirmed, rejecting the defense argument that the evidence required either his conviction of murder or his outright acquittal, but was insufficient to sustain a finding of voluntary manslaughter. See also *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.

Because I believe that there is considerable evidence in the record to establish a sufficiently serious and continuous provocation by the decedent just before the shooting, I would reduce the degree of the offense from murder to voluntary manslaughter and remand for resentencing.