## THOMAS GEDYE

### *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1897.*

1. MURDER—*what competent in murder trial as showing that defendant anticipated an encounter.* On the trial of a landlord for murdering a son of his tenant in an encounter which took place on an attempt by the landlord to smoke the tenant out and carry away window sash from the house, it is competent to prove that there was snow on the ground and that the tenant's youngest child was a mere baby, as showing that the landlord probably knew that his attempt would be desperately resisted.

2. SAME—*what sufficient to sustain a conviction for murder.* Evidence that the defendant went to his tenant's house on a winter morning and stopped up the chimney so as to smoke the occupants out, and was carrying away the sash from a window when he was interrupted by the tenant and his son, and that in the encounter which took place on their resisting the attempt to carry away the sash the defendant stabbed the son in the breast with an iron rod, killing him, is sufficient to sustain a conviction for murder.

3. SAME—*when theory of self-defense is not sustained by evidence.* A theory that the defendant charged with murdering the son of his tenant was retreating when the deceased became the aggressor, and that the mortal wound was inflicted by the defendant in self-defense, is not sustained by evidence that the defendant, when retreating, was carrying away window sash from the tenant's house in furtherance of his attempt to make the house uninhabitable, and that the fatal encounter resulted from the son's resisting the attempt to carry away the sash, as he might rightfully do.

4. SAME—*tenant may forcibly resist landlord's unlawful attempt at forcible eviction.* A tenant may defend with force the rented premises constituting his home, against his landlord's unlawful attempt to drive him out by stopping up the chimney and removing a window from the house in the winter, so as to make it uninhabitable, even though the tenant is in arrear for rent.

5. EVIDENCE—*what not reversible error in admission of evidence at murder trial.* Evidence admitted in a murder trial that the deceased, who had been stabbed in the breast by the defendant with a sharp iron rod, ran a short distance, and, exposing his breast, said, "Look where he speared me: I am done; I am gone," immediately expiring, is not reversible error, whether the declaration was a dying declaration or not, where the truth of the statement is undisputed.

WRIT OF ERROR to the Circuit Court of LaSalle county; the Hon. CHARLES BLANCHARD, Judge, presiding.

BUTTERS, CARR & GLEIM, for plaintiff in error.

EDWARD C. AKIN, Attorney General, (D. C. HAGLE, C. A. HILL, WILLIAM H. STEAD, and EDGAR ELDREDGE, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

At the March term, 1897, of the circuit court of La-Salle county, the plaintiff in error was convicted of the murder of William Morgan, and sentenced to the penitentiary for a term of fourteen years. The evidence at the trial was to the following effect: The defendant, Thomas Gedye, owned a lot about one hundred feet square, fronting west on Cash street, in Seneca, Illinois, on which there were three dwelling houses. The one on the north side of the lot was a double house, the north half of which was vacant and the south half was occupied by his tenant, Charles Morgan, with his family, consisting of his wife, Melinda Morgan, their son William Morgan, the deceased, who was twenty-three years old, another son, James Morgan, fourteen years old, and an infant child about one year old, and they had a boarder, a man named Jack. Fourteen and a half feet south of this double house was another of the houses, occupied by another tenant, and the house on the south side of the lot was the residence of the defendant, Gedye. On February 15, 1897, the Morgans owed one month's rent, which was due on the 11th, and defendant called at the house on that evening and told Mrs. Morgan if she could not pay the rent by the next night he wanted an empty house. She told him that he would have to give them more time, and that they could not move out in that time. The men of the Morgan family were coal miners, and the next morning,

about half-past six o'clock, Gedye saw the young man, William Morgan, and the boarder, Jack, start for the coal mine where they worked. Soon after, Gedye, supposing that only the father, Charles Morgan, was at home with the family, went to his barn and took an iron rod half an inch thick and about six feet long, drawn to a sharp point at one end and used as a spear for killing muskrats, and procuring a piece of blanket or old rag which he carried in a game bag, went into the kitchen in the vacant half of the Morgan house, opened the chimney-hole on that side of the partition and shoved the piece of blanket or rag downward and into the chimney-hole on the other side, to smoke the family out of the house. Smoke filled the house, and, the inmates supposing it to be on fire, Charles Morgan was trying to find out what was the matter. In the meantime Gedye went around to the front and took off the storm-door and carried it away, leaving the spear setting by the house. He came back with a hammer and chisel, and going to the west window on the south side set the spear down by the house and took out the upper sash by removing the casing. He was proceeding to take out the lower sash when Charles Morgan came around behind him and took hold of his arm, and William Morgan, who had returned, appeared at the open window on the inside. When Charles Morgan took hold of his arm, Gedye was gathering up his tools and attempting to take the sash away, but dropped them and struck Charles Morgan on the neck with the spear. William Morgan jumped out of the window and running to the kitchen got an old shot-gun and came back to where Gedye was. A combat took place between them, in which William Morgan used the shot-gun and Gedye the spear. William Morgan struck Gedye with the shot-gun probably two or three times, and one blow broke the gun stock and knocked Gedye down upon his hands and knees, but he got up and thrust the spear into the breast of William Morgan, penetrating his heart. The wounded man ran

around the house and across an alley into the house of a neighbor, where he fell upon the floor and expired.

It is argued that although Gedye wrongfully attempted to drive the Morgan family out of their home, filled it with smoke and was taking out the windows, yet he had started to retreat before the mortal blow was given; that the Morgans became the aggressors, and that such final blow was in self-defense. We do not see how this position can be maintained under the evidence. There are some inconsistencies between the testimony of members of the family given at the coroner's inquest and upon the trial of the cause, but the jury and trial judge, who saw and heard them testify, believed in their truthfulness with better opportunities for judging than we have; and even considering it, as we must, upon the record merely, we do not think that, when all the evidence is considered, it fairly tends to prove that Gedye retreated or in any manner in good faith endeavored to decline further struggle with the deceased before killing him. Gedye, of course, expected trouble and opposition in his undertaking, and testified that he expected danger and that Charles Morgan would not let him prosecute his enterprise without a contest. He did not anticipate any danger from William Morgan because he supposed that he was absent, and believed he could overcome the resistance of Charles Morgan. He knew that the family would not let him smoke them out and take out their windows in the winter time without active resistance. He was the aggressor, and the Morgans had a right to defend their habitation. After bringing on the difficulty it is true that he discovered the presence of William Morgan, and, realizing that the odds might be against him, perhaps attempted, as he says, to carry off the sash which he had taken out. According to his account of the retreat that was all there was of it, and he was trying to get away with the sash. That was nothing but a prosecution of the same enterprise of freezing the family out, which they

were resisting and had a right to resist. The encounter lasted but a few minutes and was near the house—between it and the other house, which was fourteen and a half feet away. Gedye did not claim to remember distinctly what did happen after he was struck by the gun, and a disinterested witness, who had the best opportunity to see what occurred, testified that he advanced upon the deceased and thrust the spear into his breast. There was other evidence of disinterested witnesses showing that Gedye was the assailant when the mortal blow was given. We see no reason for disturbing the conclusion of the jury and trial judge from the evidence.

It is complained because the court admitted proof of the state of the weather,—that there was snow on the ground, and that the youngest member of the family was a baby about a year old. It was material and proper to show the conditions under which Gedye undertook to dismantle the house and smoke the family out, for the purpose of determining whether a reasonable man would anticipate such a difficulty as occurred as a probable consequence of his acts. Under the conditions shown, any sane man would know that the Morgan family would not submit to the wanton invasion of their habitation. The evidence was competent to show that Gedye provoked the difficulty under such circumstances as would excite certain and probably desperate resistance.

It is also objected that the court admitted in evidence statements made by William Morgan to Annie Lettsome after he was wounded, while going into the neighbor's house where he immediately died. She testified that he pulled his shirt away and showing the wound said: "Look where he speared me; I am done; I am gone." In the first place, the statement had already been testified to without objection by Elizabeth Suddick, and was already in evidence. In the next place, it was a fact about which there was no dispute or question. No possible harm came to defendant by its admission, and it is not worth our

while to discuss questions whether it was a dying decla-
ration or part of the *res gestæ.* The same may be said as
to a statement of Melinda Morgan, wife of Charles Mor-
gan, as to what Charles Morgan said during the occur-
rence when he came into the kitchen and shut the door.
Charles Morgan had already testified, without objection,
to the same thing in substance, and there had been no
contradiction of it. It may be added as to the last state-
ment, that it was unquestionably a part of the *res gestæ.*

During the cross-examination of Charles Morgan he
was asked if he did not testify to a certain fact before
the coroner's jury, and he said that he did not think he
did but would not swear that he did not, for he hardly
knew what he did say that night. He was then asked,
"If you did testify to that, was it true or not?" He an-
swered, "I won't swear, sir." And after the answer the
court sustained an objection to the question. This is com-
plained of, but there was no error in the ruling. Counsel
was not debarred from asking the witness whether the
fact existed and whether the witness had so testified, and
did examine him fully on both those questions.

The court gave a great many instructions on behalf
of defendant in all the varying forms in which the same
propositions of law are usually differentiated in criminal
cases, dwelling in different instructions, with needless
reiteration, upon the doctrine of reasonable doubt and
the rules of law favorable to the defendant; but objection
is still made because more were not given. It is urged
that the 46th and 47th instructions on the question of
self-defense should have been given. They were both
bad. The 46th stated, in substance, that the jury should
find the defendant not guilty if there was a reasonable
doubt as to whether he was acting in necessary self-
defense in killing William Morgan. There might be a·
reasonable doubt, and the jury be perfectly convinced
on that subject that he was not acting in necessary self-
defense, and yet the instruction would require an acquit-

170—19

tal.   The 47th was of the same character, and, besides, made no reference whatever to the evidence.   The 22d, 24th, 25th and 29th instructions given at the request of the defendant covered the whole doctrine of self-defense, and the 29th covered the ground which was doubtless intended to be stated in the 46th and 47th, by requiring that the jury should believe, from the evidence, to a moral certainty, that the wound was not inflicted by the defendant on the deceased in necessary self-defense, within the meaning of the instructions.   The defendant could not ask more than was there stated.   There was no error in giving or refusing instructions of which the defendant had any cause for complaint, and the record is remarkably free from error of any sort.

The judgment will be affirmed.

*Judgment affirmed.*