2021 IL App (1st) 190024-U

No. 1-19-0024

Order filed May 19, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 7901 |
| | ) | |
| ANASTACIO GONZALES, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's convictions affirmed where the trial court did not abuse its discretion in declining to instruct the jury on second degree murder based on provocation.

¶ 2   Following a jury trial, defendant Anastacio Gonzales was found guilty of first degree murder and armed robbery and sentenced to 30 years' imprisonment. On appeal, defendant argues he was denied a fair trial when the trial court refused to instruct the jury on second degree murder by reason of sudden provocation where there was evidence that the deceased committed a

substantial physical assault by pushing defendant and threatening him with a knife. For the following reasons, we affirm.

¶ 3    Defendant was charged by 10-count indictment with the first degree murder of Hermenegildo Vilchis[1] and the armed robbery of Hermenegildo and Jacquelin Vilchis.[2] The State proceeded to trial on two counts of first degree murder (intentional and strong probability) (720 ILCS 5/9-1(a)(1), (2) (West 2014)) and one count of armed robbery to Jacquelin (720 ILCS 5/18-2(a)(1) (West 2014)).

¶ 4    At trial, Maria Perla Gomez testified through an interpreter that she was married to Hermenegildo and they had one child, Jacquelin. Hermenegildo owned a restaurant, El Taco Naco. Gomez, Hermenegildo, Jacquelin, and defendant remained at El Taco Naco after it closed at 12 a.m. on April 18, 2015. Gomez had known defendant for five years and saw him daily. While Hermenegildo was standing by the stairs leading to the bathroom, defendant approached him until he was "[v]ery close." Hermenegildo then "fell." Gomez yelled for Jacquelin to call the police. Defendant went to Jacquelin holding a knife and said he would kill her if she did not give him the phone. Gomez grabbed defendant from behind. Jacquelin gave him the phone and ran to the basement. Defendant then returned to Hermenegildo, who was lying down, and stabbed him two more times. Gomez pulled defendant off Hermenegildo and yelled. Defendant just looked at Gomez and later left the restaurant.

---

[1] The indictment reads "Hermenegildo," but elsewhere the record refers to him as "Hermengildo." We refer to him as Hermenegildo.

[2] The indictment reads "Jacqueline," but she testified her name is spelled "Jacquelin." We refer to her as Jacquelin. Because Hermenegildo and Jacquelin share a last name, we refer to them by their first names.

¶ 5   On cross-examination, Gomez testified that Hermenegildo was in a hallway near the kitchen at the time of the incident. She could not hear the words of his conversation with defendant, but defendant sounded angry. Gomez knew the argument regarded a key, but she told detectives that defendant was upset because Jacquelin put salt and lemon in his beer. Hermenegildo drank one whiskey that day.

¶ 6   On redirect examination, Gomez testified that Hermenegildo was going to give defendant a key to a room in the restaurant so that he could live there starting on May 1st. Defendant drank about 10 beers the day of the incident.

¶ 7   Jacquelin testified she was 11 years old in April 2015. Sometime after midnight on April 18, 2015, Hermenegildo went to the basement while she sat in the front of the restaurant watching videos on her mom's phone. Defendant approached Jacquelin and asked where Hermenegildo was. Defendant did not appear "calm," as he was "shaking a lot" and his tone of voice was "[m]ad."

¶ 8   When Hermenegildo came up from the basement, defendant approached him and asked for "the keys." Hermenegildo replied, "what keys?" Defendant explained that he wanted the keys to the back door, and Hermenegildo replied that he was not going to give defendant those keys. Hermenegildo held his hands open to his sides with his palms facing out and said, "[W]hat are you going to do about it?" Jacquelin did not see anything in Hermenegildo's hands. Defendant then stabbed Hermenegildo's stomach with a knife and Hermenegildo dropped to the floor. Jacquelin screamed and Gomez yelled for her to call the police. Jacquelin took the phone out of her pocket, but defendant approached her with the knife in his hand and said if she did not give the phone to him he would stab her. Jacquelin gave defendant the phone and ran to the basement, where she called the police on a landline.

¶ 9    Chicago police evidence technician Kenneth Leflore testified that he photographed the crime scene. While in the restaurant, he observed a large pool of blood in the area near the top of the basement stairs. After processing the crime scene, Leflore went to the hospital to photograph Hermenegildo's body.

¶ 10    Chicago police officer Daniel Houlihan testified that he arrested defendant on April 18, 2015. Houlihan observed what appeared to be blood on defendant's hands and clothing.

¶ 11    Chicago police officer Carlitos Perez testified that he transported defendant to the police station. Upon arrival to the station, defendant asked Perez in Spanish "if the person had died." Perez responded that he did not have that information, and defendant said, "[H]e's lucky if he didn't die."

¶ 12    Chicago police detective Destry Wilborn testified that, at the police station, he spoke with defendant in an interview room equipped with audio and video recording devices. Clips of the video were entered into evidence. In his videotaped statement, defendant states that he worked at the restaurant without pay and that he is a "good man, but sometimes, you know, they make me mad." A month prior to the incident, defendant asked Hermenegildo if he could stay in a spare room in the restaurant because his building was being sold, and Hermenegildo agreed.

¶ 13    On the night of the incident, defendant asked for keys to the room and Hermenegildo ignored him. Defendant became "so mad," he went to the kitchen, got a knife, and "jump[ed]" Hermenegildo. Defendant continues, "[T]onight they hurt my feeling." He states he drank a six-pack of beer that night. When asked how many times he "poked" Hermenegildo, defendant responds "one time." Defendant also states, "Oh my god. The devil get in my mind." Defendant repeatedly expresses concern over whether Hermenegildo is okay. Defendant also informs

Wilborn where he threw the knife he used. Wilborn testified he later located the knife and identified the "large butcher knife" at trial.

¶ 14    Dr. Loren Woertz, an expert in forensic pathology, testified that she performed a post-mortem examination on Hermenegildo and observed three stab wounds: a 5 1/2 inch deep wound in the right side of his chest and two wounds in the lower right side of his back, one 7 1/2 inches deep, the other 1 1/2 inches deep. His chest stab wound injured his skin and soft tissue, the front of his rib cage at the right third intercostal space, the middle lobe of his right lung, the sack surrounding his heart, and his heart itself, including his aorta and aorta valve. One back stab wound injured his skin, soft tissue, and his bowel mesentery. The other back stab wound injured his skin and soft tissue. In Woertz's opinion, Hermenegildo died as a result of multiple stab wounds, and the manner of death was homicide. A toxicology test for alcohol was negative. On cross-examination, Woertz testified that Hermenegildo was also diagnosed with having a fatty liver, which is most commonly caused by alcoholism.

¶ 15    The State entered a stipulation that if called, Chicago police evidence technician William Stec, would testify that on April 18, 2015, he recovered a chef's knife with an approximately 11-inch long blade associated with the incident.

¶ 16    Illinois State Police forensic scientist Lynette Wilson, an expert in forensic DNA analysis, testified that she identified a male DNA profile that matched Hermenegildo's DNA on swabs taken from defendant's shoe and the blade of the knife. A swab taken from the knife handle contained a major human male DNA profile that matched the Hermenegildo's DNA profile and two minor DNA profiles that were not suitable for comparison. DNA from swabs from Hermenegildo's fingernail clippings did not match defendant.

¶ 17 Defendant testified through an interpreter that he knew Hermenegildo for approximately five years and they were "like brothers." Defendant helped out at El Taco Naco in exchange for food. At some point in 2015, Hermenegildo told defendant he could move into the back room of the restaurant. Defendant testified that Hermenegildo offered the room to him so that he could continue to "help" Hermenegildo like he "always did."

¶ 18 On April 17, 2015, defendant went to the restaurant around 2 p.m. Defendant drank approximately 40 beers that day, while Hermenegildo drank beer and hard liquor. Around 1 a.m., defendant and Hermenegildo were in the kitchen, and Hermenegildo asked when defendant was going to move in. Defendant told Hermenegildo that he already had a place to live, after which Hermenegildo "became upset." Hermenegildo, who was taller and weighed more than defendant, raised his voice and pushed defendant with open palms, causing defendant to fall backwards almost to the floor.

¶ 19 When defendant stood, Hermenegildo had a knife in his hand and defendant thought he was going to "attack." Defendant then pushed Hermenegildo with both hands, the knife fell, and defendant grabbed it. Hermenegildo came towards defendant trying to take the knife, and defendant feared for his life. Hermenegildo got closer to defendant, and "that's when the knife went in." Defendant testified, "Even though he was stabbed in the chest, he still was attacking me," which made defendant "even more nervous" because Hermenegildo "looked violent." Because he was afraid, defendant stabbed Hermenegildo two more times. He testified that he was "still drunk" when he was interviewed at the police station, and acknowledged differences between his videotaped statement and his testimony. He asked Perez if Hermenegildo was dead because Hermenegildo was his best friend and he did not want him to die.

¶ 20    On cross-examination, defendant identified the knife he used to stab Hermenegildo. He stated he "wasn't upset at any moment" when Hermenegildo refused to give him the key. Defendant testified he did take Jacquelin's phone, but did not then stab Hermenegildo two more times. He did stab Hermenegildo twice more, but did not "come back" to do it. Defendant testified he "didn't have any choice" but to stab Hermenegildo twice more after initially stabbing him once because Hermenegildo was "attacking" him. He explained that after Hermenegildo saw the blood from the initial stab wound, he "went after" defendant. Defendant did not turn himself into police because he was nervous.

¶ 21    On recross-examination, defendant testified he did not stab anyone, but that it happened "accidently."

¶ 22    In rebuttal, the State entered a certified copy of defendant's prior felony conviction for theft.

¶ 23    During the jury instruction conference, defense counsel asked for a second degree murder instruction under both provocation and unreasonable belief in self-defense. Defense counsel argued defendant acted under sudden and intense passion from serious provocation by Hermenegildo because he testified Hermenegildo threatened him and he feared for his life. The State objected. The trial court agreed to instruct the jury on second degree murder based on unreasonable belief in the need to use deadly force, but refused a provocation-based second degree murder instruction. The court stated:

> "As a matter of fact, he testified *** on cross *** that he was never upset during this whole thing but he reacted when the victim who is taller and bigger pushed him when the victim became upset because the defendant who was never upset told him that he ***

already had a place to live. That's when according to the defendant the victim pushed the defendant. The victim was taller and bigger than the defendant. The defendant fell backward when pushed almost to the floor. At that time the victim had a knife in his hand, and the defendant thought that the victim would attack \*\*\*. When the defendant pushed the victim, the victim dropped the knife, the defendant picked up the knife. The victim came at the defendant \*\*\*. The defendant feared for his life. The victim came closer and that's when he stabbed the victim.

The victim continued to attack him. He became more afraid so he stabbed him two more times.

So provocation is not the issue. Self-defense is the issue, and in a situation that wasn't started by the victim, if the jury believes that."

¶ 24 The jury was instructed on self-defense and second degree murder based on an unnecessary belief in the need for self-defense. During jury deliberations, the jury sent a note asking the court to clarify the verbiage regarding mitigating factors. The jury attached the second degree murder instruction and underlined the instructions that stated, "That the defendant at the time he performed the acts which caused the death of Mr. Vilchis believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable." The trial court instructed the jury, "You have the instructions. Please continue to deliberate."

¶ 25 The jury found defendant guilty of the first degree murder of Hermenegildo and the armed robbery of Jacquelin. The trial court denied defendant's motion for a new trial. The court then merged the first degree murder counts and sentenced defendant to 24 years' imprisonment for first degree murder and a consecutive six years' imprisonment for armed robbery.

¶ 26    On appeal, defendant argues he was denied a fair trial when the trial court refused to instruct the jury on second degree murder by reason of sudden provocation where there was evidence that Hermenegildo committed a substantial physical assault by pushing defendant and threatening him with a knife. Defendant concedes that he failed to preserve his claim for review by failing to include it in his motion for a new trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (objection both at trial and in a posttrial motion is required to preserve an issue for appeal). Nevertheless, defendant asserts we can review his claim for plain error.

¶ 27    The plain error doctrine allows us to consider otherwise forfeited claims of error where a "clear and obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The burden of persuasion is on the defendant to establish plain error. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). Our first question is whether an error occurred at all. *Id.*

¶ 28    Where the evidence at trial supports a jury instruction on a defendant's second degree murder theory, the defendant is entitled to have such instruction. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997). So long as there is "*some evidence*" that, if believed by the jury, would support that theory, the instruction must be given. (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. When determining whether evidence supporting the theory exists, the trial court may not weigh the evidence or determine its credibility. *Id.* We review a trial court's determination that there was insufficient evidence to justify giving a jury instruction for an abuse of discretion, which

occurs only when its ruling was arbitrary or unreasonable to the degree that no reasonable person would agree. *Id.* ¶¶ 32, 42.

¶ 29    As charged here, a person commits first degree murder when, in performing the acts that cause death and without lawful justification, he (1) intends to kill or do great bodily harm to the victim, or knows that his acts will cause the victim's death, or (2) knows that his acts create a strong probability of death or great bodily harm to the victim. 720 ILCS 5/9-1(a)(1), (2) (West 2014). Self-defense is lawful justification for first degree murder. 720 ILCS 5/7-1(a) (West 2014). In contrast, second degree murder is mitigated first degree murder. 720 ILCS 5/9-2(a) (West 2014).

¶ 30    Second degree murder occurs when a person commits the offense of first degree murder, but either of two mitigating factors is present: (1) sudden and intense passion resulting from serious provocation by the victim or (2) an unreasonable belief of the need to use self-defense. 720 ILCS 5/9-2(a) (West 2014); *McDonald*, 2016 IL 118882, ¶ 59. Defendant challenges the trial court's denial of a second degree murder instruction premised on serious provocation.

¶ 31    A defendant must demonstrate both passion and serious provocation. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 46. "Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2014). There are four categories of provocation serious enough to meet this definition: substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *McDonald*, 2016 IL 118882, ¶ 59.

¶ 32    Defendant argues here that there was some evidence for a second degree murder instruction premised on serious provocation resulting from substantial physical assault. He argues his testimony shows Hermenegildo, who was physically larger than him, forcefully pushed him during

a heated argument while brandishing an 11-inch long knife. The State counters that defendant's testimony that Hermenegildo initiated the physical altercation by pushing defendant while holding a knife, and that defendant stabbed Hermenegildo after picking up the knife because Hermenegildo advanced on him, shows defendant's actions were defensive and motivated by fear, not the result of a sudden and intense passion provoked by a substantial physical assault. The State also notes that defendant's testimony contradicts his videotaped statement, in which he claimed he attacked Hermenegildo. The State adds that Hermenegildo pushing defendant while holding a knife failed to constitute a substantial physical assault.

¶ 33    After review of the record, we find no evidence supporting defendant's requested second degree murder instruction premised on serious provocation resulting from substantial physical attack. Defendant did not testify his actions were the result of a sudden and intense passion stemming from Hermenegildo's assault. On the contrary, he testified he was never "upset." Further, he consistently testified that he stabbed Hermenegildo because he was afraid for his life.

¶ 34    Defendant testified that, after an argument, Hermenegildo got upset and pushed him while holding a knife. Defendant believed he was about to be attacked and responded by pushing Hermenegildo with both hands. Defendant then grabbed the knife and, when Hermenegildo came towards defendant to try to take the knife back, defendant feared for his life and stabbed him. Hermenegildo continued to attack defendant, which made defendant "even more nervous" because Hermenegildo "looked violent." Defendant testified that, because he was afraid of Hermenegildo, he then stabbed Hermenegildo twice more. Defendant's testimony that he was not "upset" and that he stabbed Hermenegildo because he feared for his life did not support a second degree murder instruction premised on sudden and intense passion arising from serious provocation. See *People*

*v. Harmon*, 2015 IL App (1st) 122345, ¶ 92 ("Self-defense or defense of others is not equivalent to acting under sudden and intense passion resulting from provocation."); *People v. Slaughter*, 84 Ill. App. 3d 1103, 1110 (1980) (finding that because the defendant was motivated by fear and claimed to have acted in self-defense, rather than being motivated by sudden and intense passion due to serious provocation, the trial court properly refused to give an instruction on provocation voluntary manslaughter).

¶ 35    Defendant's videotaped statement also did not provide evidence supporting the instruction. In the video interview with detectives, defendant expressed that he helped the Vilchis family by working at El Taco Naco without pay, and that the family sometimes made him mad. When defendant asked for keys to a room in the restaurant, Hermenegildo ignored him. Defendant got mad, retrieved a knife from the kitchen, and then "jump[ed]" Hermenegildo. Defendant told police the devil got in his mind during the attack, arguably supporting that he acted under a sudden and intense passion. But a defendant must show both passion and serious provocation. *Bennett*, 2017 IL App (1st) 151619, ¶ 46. Noticeably absent from defendant's interview statement was any mention that Hermenegildo physically assaulted defendant. Rather, defendant's videotaped statement provided evidence that defendant initiated an attack on Hermenegildo, not that Hermenegildo attacked him as required for a jury instruction based on serious provocation due to substantial physical assault.

¶ 36    Accordingly, the trial court did not abuse its discretion by giving jury instructions on self-defense and second degree premised on an unreasonable belief in self-defense and not on second degree murder premised on serious provocation. Because the court did not abuse its discretion in

denying the requested jury instruction, there was no error, and accordingly, there can be no plain error. See *Walker*, 232 Ill. 2d at 124.

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 38    Affirmed.